(No. 76063.—

*In re* PETITION OF JOHN DOE AND JANE DOE, Husband and Wife, to Adopt Baby Boy Janikova (John Doe *et al.*, Appellees; Otakar Kirchner, Appellant).

*Opinion filed June 16, 1994.—Rehearing denied July 12, 1994.*

348

McMORROW, J., joined by MILLER and FREEMAN, JJ., concurring.

HEIPLE and FREEMAN, JJ., writing in support of the denial of rehearing.

McMORROW, J., joined by MILLER, J., dissenting from the denial of rehearing.

Loren L. Heinemann, of Orland Park, for appellant.

Richard A. Lifshitz, Carolyn E. Winter and R. Peter Carey, of Mandel, Lipton & Stevenson, Ltd., of Chicago, for appellees.

Edward J. O'Connell, guardian *ad litem*, and Patrick T. Murphy, Kass A. Plain, Lee Ann Lowder and Mary Kenney, of the Office of the Cook County Public Guardian, all of Chicago, for Baby Boy Janikova.

Bruce A. Boyer, Annette Ruth Appell and Zelda B. Harris, of Chicago, for *amicus curiae* Children & Family Justice Center of Northwestern University Legal Clinic.

Diane L. Redleaf and Amy Zimmerman, both of Chicago, for *amicus curiae* Legal Assistance Foundation of Chicago.

William E. Rattner and Kathleen M. Burch, of Hopkins & Sutter, of Chicago, for *amicus curiae* Juvenile Protective Association.

Suellyn Scarnecchia, of Ann Arbor, Michigan (Anne C. Auten, Kristen A. Donaghue, Keri Goldstein, Lara A.V. Hutner, Kacy Kleinhans, David A. Schwartz and

Gregory J. Stanton, law students), for *amicus curiae* Child Advocacy Law Clinic.

· Joshua Mark Zucker, of Chicago, for *amicus curiae* The Yale University Child Study Center.

JUSTICE HEIPLE delivered the opinion of the court:

John and Jane Doe filed a petition to adopt a newborn baby boy. The baby's biological mother, Daniella Janikova, executed a consent to have the baby adopted four days after his birth without informing his biological father, Otakar Kirchner, to whom she was not yet married.

The mother told the father that the baby had died, and he did not find out otherwise until 57 days after the birth. The trial court ruled that the father's consent was unnecessary because he did not show sufficient interest in the child during the first 30 days of the child's life. The appellate court affirmed with one justice dissenting. (254 Ill. App. 3d 405.) We granted leave to appeal (134 Ill. 2d R. 315) and now reverse.

Otakar and Daniella began living together in the fall of 1989, and Daniella became pregnant in June of 1990. For the first eight months of her pregnancy, Otakar provided for all of her expenses.

In late January 1991, Otakar went to his native Czechoslovakia to attend to his gravely ill grandmother for two weeks. During this time, Daniella received a phone call from Otakar's aunt saying that Otakar had resumed a former romantic relationship with another woman.

Because of this unsettling news, Daniella left their shared apartment, refused to talk with Otakar on his return, and gave birth to the child at a different hospital than where they had originally planned. She gave her consent to the adoption of the child by the Does, telling

them and their attorney that she knew who the father was but would not furnish his name. Daniella and her uncle warded off Otakar's persistent inquiries about the child by telling him that the child had died shortly after birth.

Otakar found out that the child was alive and had been placed for adoption 57 days after the child was born. He then began the instant proceedings by filing an appearance contesting the Does' adoption of his son. As already noted, the trial court ruled that Otakar was an unfit parent under section 1 of the Adoption Act (the Act) (750 ILCS 50/1 (West 1992)) because he had not shown a reasonable degree of interest in the child within the first 30 days of his life. Therefore, the father's consent was unnecessary under section 8 of the Act (750 ILCS 50/8 (West 1992)).

The finding that the father had not shown a reasonable degree of interest in the child is not supported by the evidence. In fact, he made various attempts to locate the child, all of which were either frustrated or blocked by the actions of the mother. Further, the mother was aided by the attorney for the adoptive parents, who failed to make any effort to ascertain the name or address of the father despite the fact that the mother indicated she knew who he was. Under the circumstances, the father had no opportunity to discharge any familial duty.

In the opinion below, the appellate court, wholly missing the threshold issue in this case, dwelt on the best interests of the child. Since, however, the father's parental interest was improperly terminated, there was no occasion to reach the factor of the child's best interests. That point should never have been reached and need never have been discussed.

Unfortunately, over three years have elapsed since the birth of the baby who is the subject of these

proceedings. To the extent that it is relevant to assign fault in this case, the fault here lies initially with the mother, who fraudulently tried to deprive the father of his rights, and secondly, with the adoptive parents and their attorney, who proceeded with the adoption when they knew that a real father was out there who had been denied knowledge of his baby's existence. When the father entered his appearance in the adoption proceedings 57 days after the baby's birth and demanded his rights as a father, the petitioners should have relinquished the baby at that time. It was their decision to prolong this litigation through a lengthy, and ultimately fruitless, appeal.

The adoption laws of Illinois are neither complex nor difficult of application. Those laws intentionally place the burden of proof on the adoptive parents in establishing both the relinquishment and/or unfitness of the natural parents and, coincidentally, the fitness and the right to adopt of the adoptive parents. In addition, Illinois law requires a good-faith effort to notify the natural parents of the adoption proceedings. These laws are designed to protect natural parents in their preemptive rights to their own children wholly apart from any consideration of the so-called best interests of the child. If it were otherwise, few parents would be secure in the custody of their own children. If best interests of the child were a sufficient qualification to determine child custody, anyone with superior income, intelligence, education, etc., might challenge and deprive the parents of their right to their own children. The law is otherwise and was not complied with in this case.

Accordingly, we reverse.

*Appellate court reversed;*
*circuit court reversed.*

JUSTICE McMORROW, concurring:

I agree with the majority's reversal of the trial court's termination of the respondent's parental rights with respect to his son. However, I believe that the importance of the issues presented in this appeal warrants a more comprehensive analysis than that offered by the majority. Consequently, I write separately to state in greater detail the reasons for my conclusion that the decisions of the trial court and the appellate court were in error.

The facts of this case are set forth in detail in the appellate court proceeding (254 Ill. App. 3d 405) and need not be restated in full at this juncture. The appellate court addressed two issues that are raised in this appeal. As considered by the appellate court, the first issue involves whether the perceived "best interests" of the child to remain with his adoptive parents outweighed any consideration of the parental fitness of the respondent. The second question addressed by the appellate court is whether the trial court properly found that respondent was an unfit father under the Adoption Act (750 ILCS 50/1(D)(1) (West 1992)).

I consider each of these issues *seriatim*.

I

The appellate court held that the respondent's parental rights could lawfully be abrogated, without regard to whether the respondent is unfit, where the court perceives that such termination of parental rights would be "in the best interest of the child." (See 254 Ill. App. 3d at 410-14.) As a result, the appellate court found that the child's "best interests" could override any consideration of the respondent's parental fitness.

To justify its conclusion, the appellate court in the present case found it significant that the Illinois legislature has declared in the Adoption Act that the "best interests and welfare of the person to be adopted shall be of paramount consideration in the construction

and interpretation of this Act." (750 ILCS 50/20a (West 1992).) I do not believe that this broad policy statement justifies the appellate court's holding.

Notwithstanding this statement of policy, the Adoption Act nevertheless specifically requires that a parent who does not consent to adoption must be found unfit before parental rights may be terminated. (750 ILCS 50/8(a)(1) (West 1992); see also 750 ILCS 50/8(a)(3), (a)(4) (West 1992) (where child is born out of wedlock and is placed for adoption within six months from birth, consent of child's father is not required, if he was informed that he was the father, and if he failed to undertake acts, as specified in the statute, to show that he has a *bona fide* parental interest in child (*e.g.*, openly living with child, holding himself out as father of child, paying for medical expenses, or visiting with child)).) The Act does not specify, however, that the court may disregard parental fitness when the child is a newborn.

This court has previously held that a broad statement of policy does not authorize the court to act in contravention to or beyond the scope of the specific requirements of a statute. (See *In re M.M.* (1993), 156 Ill. 2d 53, 67 ("liberal construction" and "best interests" under Juvenile Court Act do not confer on trial court the authority to condition guardian's power to consent to adoption).) As a result, the broad statement of policy in the Adoption Act does not support the appellate court's ruling in the instant cause.

In addition, the appellate court's holding is at odds with this court's analysis in *In re Adoption of Syck* (1990), 138 Ill. 2d 255. In *Syck*, this court reviewed a trial court's determination that the biological mother had not expressed reasonable concern, interest or responsibility for her son, and that the mother was therefore an unfit parent under section 1(D)(b) of the Adoption Act. Under section 1(D)(b), a parent is unfit

when he or she has failed to "maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." (750 ILCS 50/1(D)(b) (West 1992).) The language in section 1(D)(b) is very similar to section 1(D)(l), at issue in the present cause, regarding a failure to demonstrate reasonable interest in, concern for, or responsibility for a newborn child (see 750 ILCS 50/1(D)(l) (West 1992) (parent unfit where parent "fail[ed] to demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of a new born child during the first 30 days after its birth")).

In *Syck*, this court held that, where it is alleged that the biological parent is unfit because of a failure to show a reasonable degree of interest in, concern, or responsibility for the child, the court must determine the parent's unfitness *before* the court can proceed to a consideration of the child's "best interests":

"When ruling on parental unfitness, a court is not to consider the child's 'best interests.' [Citations.] At this point, it is the parent's past conduct in the then-existing circumstances that is under scrutiny. [Citations.] The child's welfare and whether the child's eventual adoption by the petitioners would improve his future financial, social, and emotional atmosphere is not relevant in judging the fitness of the natural parent [citations]; nor are these factors relevant in determining, as in this case, whether, in the past, the natural parent maintained a reasonable degree of concern, interest and responsibility as to the child's welfare. Only after a parent is found, by clear and convincing evidence, to be unfit does a circuit court ruling on an adoption petition proceed to consider the child's best interests and whether those interests would be served by the child's adoption by the petitioners, requiring termination of the natural parent's parental rights. [Citations.]" *Syck*, 138 Ill. 2d at 276-77.

The appellate court in the instant cause proposed that *Syck* was "distinguishable and not controlling." (254 Ill. App. 3d at 411 n.2.) The court noted that in *Syck*, "there was no judgment of adoption entered; the

child was not a newborn, but rather was eight years old; the issue of unfitness did not relate to the first 30 days after the child's birth, as does the present case; and the issue of unfitness involved section 1(D)(b) of the Adoption Act [citation], rather than section 1(D)(l) [citation]." 254 Ill. App. 3d at 411 n.2.

These circumstances are insufficient to deviate from this court's determination in *Syck* that the child's "best interests" cannot justify termination of parental rights where the parent has not been found unfit. The rule expressed by this court in *Syck* has been applied in numerous court decisions (*In re S.J.* (1992), 233 Ill. App. 3d 88, 121; *In re Adoption of D.A.* (1991), 222 Ill. App. 3d 73, 75; *In re A.H.* (1991), 215 Ill. App. 3d 522, 530-31; *In re B.T.* (1990), 204 Ill. App. 3d 277, 281; *Perkins v. Breitbarth* (1981), 99 Ill. App. 3d 135, 139; *In re Adoption of Burton* (1976), 43 Ill. App. 3d 294, 301), including a proceeding where it was alleged that the parent was unfit under section 1(D)(l) of the Act. (*In re Adoption of J.R.G.* (1993), 247 Ill. App. 3d 104, 110.) This court's holding in *Syck* reflected the express requirements of our Adoption Act, as explained more fully above, that parental rights generally cannot be terminated unless the parent has been proven unfit. (See 750 ILCS 50/8(a) (West 1992).) In my judgment, *Syck* is both controlling and persuasive authority in the present cause.

The appellate court also relied on certain State and Federal statutory provisions. (705 ILCS 405/2—14 (West 1992) (Juvenile Court Act of 1987); 42 U.S.C. § 675(5)(C) (1988) (Adoption Assistance & Child Welfare Act).) The court "extrapolate[d] and infer[red]" from these provisions that "after a newborn child has been placed for adoption and lives continuously thereafter for longer than 18 months with his adopting parents who adopt or have adopted him pursuant to a judgment of adoption, it would be contrary to the best interest of the child to

remove him from his home and family by disturbing the judgment of adoption." 254 Ill. App. 3d at 413.

I cannot agree with the appellate court's "extrapolations" from these statutes. The appellate court *sua sponte* created an irrebuttable, *per se* presumption that, once a newborn child has lived with adoptive parents for at least 18 months, the child's living arrangements cannot be modified. However, the statutory provisions cited by the appellate court pertain to *prompt judicial disposition and review* where foster care has been requested or ordered because of child abuse, neglect, or dependency. (705 ILCS 405/2—14 (West 1992) (Juvenile Court Act); 42 U.S.C. § 675(5)(C) (1988) (Adoption Assistance & Child Welfare Act).) The statutes do not require, or suggest, that a newborn child's living environment cannot be modified if the child has lived with adoptive parents for a year and a half. Other cases cited by the appellate court in the case at bar (254 Ill. App. 3d at 411 n.2) do not justify the court's conclusion. See *Giacopelli v. Florence Crittenton Home* (1959), 16 Ill. 2d 556 (custody dispute); *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201 (custody dispute); *In re Abdullah* (1981), 85 Ill. 2d 300 (recognizing that it would not be in "best interests" of child to delay determination of biological father's fitness until father exhausted all criminal appeals and collateral review of biological father's murder conviction).

In addition, decisions from other jurisdictions do not support the appellate court's reasoning. For example, in denying the adoptive parents' application for a stay of a State court judgment that ordered return of an infant girl to her biological parents, Justice Stevens of the United States Supreme Court stated:

"Applicants' claim that [the child's] best interests will be served by allowing them to retain custody of her rests, in part, on the relationship that they have been able to develop with the child after it became clear that they

were not entitled to adopt her. Neither [state] law *** nor federal law authorizes unrelated persons to retain custody of a child whose natural parents have not been found to be unfit simply because they may be better able to provide for her future and her education. As the Iowa Supreme Court stated: '[C]ourts are not free to take children from parents simply by deciding another home appears more advantageous.' [Citation.]" *(DeBoer v. DeBoer* (1993), 509 U.S. 1301, 1302, 125 L. Ed. 2d 755, 757, 114 S. Ct. 1, 1-2.) Decisions from other States have also held that the parent's fitness must be determined *before* the court can proceed to an inquiry into the best interests of the child, and that parental rights *cannot* be terminated, under the guise of the child's "best interests," if the parent's unfitness has not been proven. See, *e.g.*, *In re B.G.C.* (Iowa 1992), 496 N.W.2d 239; *Adoption of Kelsey S.* (1992), 1 Cal. 4th 816, 823 P.2d 1216, 4 Cal. Rptr. 2d 615.

It appears that the appellate court in the present cause was persuaded to the result it reached in large part because of the time that has elapsed since the child's birth and the circumstance that the child has lived continuously with his adoptive parents since the baby was a few days old. According to the appellate court, the "only parents that he has ever known are John and Jane Doe. He has not touched or seen [his birth mother] since four days after his birth, and he has never spoken a word to her. Nor has he ever touched, seen or communicated with [his biological father]. In fact, he is totally unaware of the existence of [his biological parents]." (254 Ill. App. 3d at 413-14.) In comparison to the interests of the biological parents, the appellate court found the interests of the adoptive parents much more significant. For example, the appellate court noted that since the child "was a newborn, John and Jane Doe have done everything with [the child] that is the essence of being parents." 254 Ill. App. 3d at 414.

I find the reasoning of the appellate court misguided.

The respondent in the present case instituted proceedings to preserve his parental interest in his son less than two months after the child was born, and only a few weeks after he learned that the child was in fact alive. Although the child is now three years old, it is not the fault of the respondent that the boy has been in the custody of adoptive parents for the last three years. Nor is it the fault of the respondent that the child has not ever seen and is apparently unaware of his biological father.

No one would disagree with the view that children, especially those of tender years, should not be bandied about between biological and foster or adoptive parents. Delay damages the child, regardless of who is eventually awarded custody of the child. The parents, adoptive and biological, also suffer greatly and unnecessarily. These concerns, although valid, do not justify the appellate court's decision in the instant cause to ignore the clear requirements of our Adoption Act that parental unfitness must be proven *before* the court can proceed to a consideration of the child's best interests.

Certain of the *amici* have suggested that the adoptive parents may be able to retain *custody* of the child in the present cause by filing a petition under the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/601 (West 1992) (standing of nonparent to file petition for custody if child is not "in the physical custody of one of his parents"); 750 ILCS 5/602 (West 1992) (custody determinations must be made according to the "best interest of the child")). They offer that the instant cause should be remanded to the circuit court so that the adoptive parents may file such a petition. It is also suggested that, in such a custody proceeding, the best interests of the child would take precedence over the wishes of the biological parents. (See, *e.g., In re Brandon L.E.* (1990), 183 W. Va. 113, 394 S.E.2d 515; Clark, *Chil-*

*dren and the Constitution*, 1992 U. Ill. L. Rev. 1; Annot., 15 A.L.R.5th 692 (1993).) However, I do not address the merits of these arguments, since the questions are not properly before this court in the present appeal.

## II

The appellate court also concluded that the respondent's parental rights were properly terminated because the respondent was an unfit parent. Section 1(D)(l) of our Adoption Act defines an "unfit person" to include a parent who has "fail[ed] to demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of a new born child during the first 30 days after its birth." (750 ILCS 50/1(D)(l) (West 1992).) Relying on section 1(D)(l) of the Adoption Act, the trial court concluded that respondent was an unfit parent because he had not shown reasonable interest in his son within 30 days after the child's birth. Because termination of parental rights is a permanent and complete deprivation and severance of the relationship between child and parent, legal precedent has demanded a heightened standard of proof, *i.e.*, clear and convincing evidence, in order to prove parental unfitness. (See *Santosky v. Kramer* (1982), 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388; see also *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208; see generally *Lehr v. Robertson* (1983), 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985; *Caban v. Mohammed* (1979), 441 U.S. 380, 60 L. Ed. 2d 297, 99 S. Ct. 1760; *Quilloin v. Walcott* (1978), 434 U.S. 246, 54 L. Ed. 2d 511, 98 S. Ct. 549.) In my opinion, the proof presented here did not demonstrate, by clear and convincing evidence, that respondent was an unfit parent under section 1(D)(l) of the Adoption Act. Consequently, the trial court's determination was against the manifest weight of the evidence.

In *Syck*, 138 Ill. 2d 255, this court suggested several factors to be taken into account in deciding whether a

parent has exercised reasonable interest, concern, or responsibility in the child. The factors recited in *Syck* included whether "the actions and statements of others *** hinder[ed] or discourage[ed] visitation [citation], and whether the parent's failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference to, and lack of concern for, the child [citation]." (*Syck*, 138 Ill. 2d at 278-79.) The court also observed that, "mindful of the circumstances in each case, a court is to examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts. [Citation.]" (*Syck*, 138 Ill. 2d at 278-79.) Consistent with *Syck*, our appellate court has declined to find a parent unfit where the parent's efforts to establish or maintain parental interest in the children were thwarted, inhibited, hindered, or discouraged by the custodial parent or other interested persons. See, *e.g.*, *Peyla v. Martin* (1976), 40 Ill. App. 3d 373; *In re Jones* (1975), 34 Ill. App. 3d 603; *Culkin v. Culkin* (1975), 30 Ill. App. 3d 1073; *In re Taylor* (1975), 30 Ill. App. 3d 906.

In light of this precedent, the respondent in the present cause was not proven to be an unfit parent. As detailed in the appellate court opinion, the respondent made numerous efforts to aid the child's biological mother before the baby was born, and made numerous attempts to discover whether the child had been born. (See 254 Ill. App. 3d at 419-24 (Tully, P.J., dissenting).) However, the respondent's efforts were blocked and frustrated by the misrepresentations of the biological mother and her relatives. It is undisputed that these persons persistently lied to the respondent and told him the baby had died, although the boy had not.

The appellate court agreed with the trial court's determination that the respondent had not shown adequate, reasonable interest in the child after birth. The

appellate court believed that the respondent did not do all of the things that other persons might have done under similar circumstances to determine whether the child had actually died and to ascertain the child's whereabouts. (See 254 Ill. App. 3d at 415 (suggesting that respondent in present cause could have gone to biological mother's residence "to speak to her directly and confront her about the welfare of his expected child," or that the respondent could have contacted the prenatal physician, or conferred with an attorney or "any public legal agency").) However, the respondent's actions are not to be judged by whether they were successful, but rather by whether they were sincere, genuine efforts to locate and establish contact with the child. The record does not establish that the respondent's efforts were so insufficient or insincere that he should be deprived of his parental interests in his son.

In addition, I believe that the adoptive parents shared a portion of the risk that the respondent, if he discovered the child were still alive, would attempt to assert his parental rights to the child. The record indicates that the adoptive parents were informed of the biological mother's intention to prevent the respondent from asserting any parental interest in the child whatsoever, by misrepresenting to the respondent that the baby had died, even though the biological mother knew the father's identity, as well as his whereabouts. The adoptive parents acquiesced in the biological mother's scheme. The record is devoid of any indication that the adoptive parents made any effort to ascertain the identity of the respondent, or his whereabouts, so that he could be advised of the child's existence.

For these reasons, I concur in the decision of the majority in the instant cause.

JUSTICES MILLER and FREEMAN join in this concurrence.

## SUPPLEMENTAL OPINIONS UPON DENIAL OF REHEARING

JUSTICE HEIPLE, writing in support of the denial of rehearing:

On Thursday, June 16, 1994, this court reversed a decision by a divided appellate court which had affirmed certain adoption proceedings in the circuit court of Cook County. Our reversal was the result of the failure of the courts below to correctly apply Illinois law in terminating the natural father's parental rights. This cause is now before the court on petitions for rehearing filed by the adoptive parents and the guardian *ad litem* for the child. The following is offered in support of today's order denying rehearing.

I have been a judge for over 23 years. In that time, I have seldom before worked on a case that involved the spread of so much misinformation, nor one which dealt with as straightforward an application of law to fact.

As was made clear in the majority opinion, a conspiracy was undertaken to deny the natural father any knowledge of his son's existence. It began when the biological mother, $8^{1}/2$ months pregnant, was misinformed that the father, her fiance, had left her for another woman. She left their shared home and, at the encouragement of a social worker, agreed to give up her child. The social worker called her personal attorney, who contacted the adoptive mother (that attorney's friend and employee). At the behest of the adoptive parents and their attorney, the mother gave birth at a different hospital than she and the father had planned to avoid the father's intervention; the mother surrendered the baby to strangers four days after his birth; and then falsely told the father that the child had died. All of this occurred in the space of less than three weeks.

The father did not believe the mother, and he immediately began an intensive and persistent search

and inquiry to learn the truth and locate the child. On the 57th day following the child's birth, the father learned of his son's existence and of the pending adoption. On that day, he hired a lawyer and contested the adoption of his son by strangers. One may reasonably ask, What more could he have done? What more should he have done? The answer is that he did all that he could and should do.

The majority opinion pointed out that the adoptive parents should have relinquished the baby at that time. That is to say, on the 57th day. Instead of that, however, they were able to procure an entirely erroneous ruling from a trial judge that allowed the adoption to go forward. The father's only remedy at that stage was a legal appeal which he took. He is not the cause of the delay in this case. It was the adoptive parents' decision to prolong this litigation through a long and ultimately fruitless appeal. Now, the view has been expressed that the passage of time warrants their retention of the child; that it would not be fair to the child to return him to his natural parents, now married to each other, after the adoptive parents have delayed justice past the child's third birthday.

For a fuller and more detailed account of the father's efforts and the underlying facts, one may refer to the dissenting opinion authored by Justice Tully in the appellate court decision rendered below. (254 Ill. App. 3d 405, 418 (Tully, P.J., dissenting).) As noted by Justice Tully, Justice Rizzi, writing the majority opinion for himself and Justice Cerda, "patently distorted and slanted the facts on a number of important points." I would further add that Justice Rizzi grossly misstated the law.

If, as stated by Justice Rizzi, the best interest of the child is to be the determining factor in child custody cases (254 Ill. App. 3d at 412), persons seeking babies to

adopt might profitably frequent grocery stores and snatch babies from carts when the parent is looking the other way. Then, if custody proceedings can be delayed long enough, they can assert that they have a nicer home, a superior education, a better job or whatever, and that the best interests of the child are with the baby snatchers. Children of parents living in public housing or other conditions deemed less than affluent and children with single parents might be considered particularly fair game. The law, thankfully, is otherwise.

In 1972, the United States Supreme Court, in the case of *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208, ruled that unmarried fathers cannot be treated differently than unmarried mothers or married parents when determining their rights to the custody of their children. (*Stanley*, 405 U.S. at 658, 31 L. Ed. 2d at 562-63, 92 S. Ct. at 1216.) The courts of Illinois are bound by that decision. Subsequently, in 1990, a unanimous Illinois Supreme Court pointed out that when ruling on parental unfitness, a court is not to consider the child's best interests, since the child's welfare is not relevant in judging the fitness of the natural parent; that only after the parent is found by clear and convincing evidence to be unfit does the court proceed to consider the child's best interest and whether that interest would be served if the child were adopted by the petitioners. *In re Adoption of Syck* (1990), 138 Ill. 2d 255, 276-78.

Under Illinois law, a parent may be divested of his parental rights either voluntarily (*e.g.*, consenting to an adoption (see Ill. Rev. Stat. 1991, ch. 40, par. 1513)) or involuntarily (*e.g.*, finding of abuse, abandonment, neglect or lack of sufficient interest (see Ill. Rev. Stat. 1991, ch. 40, par. 1510)). As noted in the majority opinion, the adoption laws of Illinois are neither complex nor difficult of application. These laws intentionally place

the burden of proof on the adoptive parents. In addition, Illinois law requires a good-faith effort to notify the natural father of the adoption proceedings. (Ill. Rev. Stat. 1991, ch. 40, par. 1509.) We call this due process of law. In the case at hand, both the adoptive parents and their attorney knew that a real father existed whose name was known to the mother but who refused to disclose it. Under these circumstances, the adoptive parents proceeded at their peril.

The best interest of the child standard is not to be denigrated. It is real. However, it is not triggered until it has been validly determined that the child is *available* for adoption. And, a child is not available for adoption until the rights of his natural parents have been properly terminated. Any judge, lawyer, or guardian *ad litem* who has even the most cursory familiarity with adoption laws knows that. Justice Rizzi, if he is to be taken at face value, does not know that.

Columnist Bob Greene apparently does not care. Rather, columnist Greene has used this unfortunate controversy to stimulate readership and generate a series of syndicated newspaper columns in the Chicago Tribune and other papers that are both false and misleading. In so doing, he has wrongfully cried "fire" in a crowded theatre, and has needlessly alarmed other adoptive parents into ill-founded concerns that their own adoption proceedings may be in jeopardy. In support of his position, Greene has stirred up contempt against the Supreme Court as an institution, concluding one of his columns by referring to all of the Justices with the curse, "Damn them all." Chicago Tribune, June 19, 1994, Tempo Section, page 1.

Greene's implicit objective is to secure justice for a child. With that ethical and moral imperative, of course, no one could disagree. Greene, however, elevates himself above the facts, above the law, and above the Supreme

Court of Illinois. He arrogates to himself the right to decide the case.

In support of his objective, Greene brings to bear the tools of the demagogue, namely, incomplete information, falsity, half-truths, character assassination and spurious argumentation. He has conducted a steady assault on my abilities as a judge, headlining one of his columns "The Sloppiness of Justice Heiple." Another was entitled "Supreme Injustice for a Little Boy." He has shown my picture in his columns with bylines reading, respectively, "Justice Heiple: Ruling takes boy from home," and "James D. Heiple: No justice for a child." References to, respectively, Chicago Tribune, June 26, 1994, Tempo Section, page 1; June 19, 1994, Tempo Section, page 1; June 26, 1994, Tempo Section, page 1; June 19, 1994, Tempo Section, page 1.

Make no mistake about it. These are acts of journalistic terrorism. These columns are designed to discredit me as a judge and the Supreme Court as a dispenser of justice by stirring up disrespect and hatred among the general population.

Lest we forget the place from which he comes, let us remind ourselves that Greene is a journalist with a product to sell. He writes columns for a living. His income is dependent on writing and selling his columns to newspapers. He cannot secure either sales or earnings by writing on subjects that lack impact or drama. So, he must seek out subjects that are capable of generating wide public interest. An adoption case involving two sets of parents contesting for the custody of a three-year-old boy is a ready-made subject for this type of journalist. So far, so good.

The trouble with Greene's treatment of the subject, however, is that his columns have been biased, false and misleading. They have also been destructive to the cause of justice both in this case and in the wider perspective.

Part of Greene's fury may be attributable to the fact that he staked out his views on this case in a published column that appeared on August 22, 1993. (Chicago Tribune, August 22, 1993, Tempo Section, page 1.) Subsequently, on June 16, 1994, the Supreme Court had the audacity to base its decision on the law rather than on his newspaper column. So much for his self-professed moralizing.

That Greene has succeeded to a limited degree cannot be denied. I have, indeed, received several pieces of hate mail with such epithets as idiot, jerk, etc. The Governor, in a crass political move, announced his attempt to intervene in the case. And the General Assembly, without meaningful debate or consideration, rushed into law a constitutionally infirm statute with the goal of changing the Supreme Court's decision.

Both the Governor and the members of the General Assembly who supported this bill might be well advised to return to the classroom and take up Civics 101. The Governor, for his part, has no understanding of this case and no interest either public or private in its outcome. The legislature is not given the authority to decide private disputes between litigants. Neither does it sit as a super court to review unpopular decisions of the Supreme Court. We have three branches of government in this land. They are designated as the legislative, the executive and the judicial. Legislative adjudication of private disputes went by the wayside generations ago. Moreover, this case cannot be decided by public clamor generated by an irresponsible journalist. Neither can it be decided by its popularity or lack thereof. This case can only be decided by a court of law. That is a judicial function pure and simple. For the Supreme Court to surrender to this assault would be to surrender its independence, its integrity and its reason for being. In so doing, justice neither to the litigants nor to the public

interest would be served. Under the circumstances, this case looms even larger than the child or the two sets of contesting parents.

Many lawsuits are painful matters. This case is no exception. Capital cases, for instance, demand the forfeiture of the life of the defendant. Damage suits take money away from some people and give it to others. No one ever claimed that both sides walk away from a lawsuit with smiles on their faces. No member of this court ever entertained any thought that the decision it rendered in this case would be easy to accept by the losing litigants. Such an event would be incredible.

As for the child, age three, it is to be expected that there would be an initial shock, even a longing for a time in the absence of the persons whom he had viewed as parents. This trauma will be overcome, however, as it is every day across this land by children who suddenly find their parents separated by divorce or lost to them through death. It will not be an insurmountable trauma for a three-year-old child to be returned, at last, to his natural parents who want to raise him as their own. It will work itself out in the fullness of time. As for the adoptive parents, they will have to live with their pain and the knowledge that they wrongfully deprived a father of his child past the child's third birthday. They and their lawyer brought it on themselves.

This much is clear. Adoptive parents who comply with the law may feel secure in their adoptions. Natural parents may feel secure in their right to raise their own children. If there is a tragedy in this case, as has been suggested, then that tragedy is the wrongful breakup of a natural family and the keeping of a child by strangers without right. We must remember that the purpose of an adoption is to provide a home for a child, not a child for a home.

JUSTICE FREEMAN, also writing in support of the denial of rehearing:

I wholeheartedly concur in the court's decision to deny rehearing in this case.

In the weeks since the publication of this court's opinion in this case, there has been a tremendous public outcry. In light of the immediate consequences to all concerned, such was to be expected. We are, nonetheless, no less focused or certain of our mandate. We are constrained to interpret and apply the law as it is enacted by our legislature. This remains so, even in the midst of strong public opinion, media attention, and legislative action which comes now, only in the wake of what has been popularly deemed an unpopular decision. Our role is clear, and we possess no authority to deviate from our mandate. To now entreat and, further, require that we either rewrite or apply a law enacted based upon the testing of public opinion, results in an unworkable restructuring of the three branches of government.

To avoid what promises to be an emotionally difficult transition for this child, public sentiment would have us find that it is in his best interest to validate this adoption. For as much as this child has been received, loved and cared for by his adoptive parents, we may not rule oblivious to and in total disregard of the rights of his natural parents.

As petitioner correctly concedes, we are constrained to determine the issue of unfitness prior to engaging in any determination of the child's best interest. This we have done. We have reviewed the particularly unique set of facts in this case. And, based upon that review, we have determined that a conclusion opposite that which the trial and appellate courts reached is clearly evident.

Petitioner asserts that in our review, we have inappropriately reweighed the evidence, and, in effect, substituted our judgment for that of the trial court. Our

consideration of the evidence necessarily requires some sifting to determine its adequacy. Such a review, though not without limitation, is clearly within our province and requires more than a mere perfunctory examination.

In light of our findings, no purpose can be served by allowing rehearing in this case. The only thing to be gained by such unwarranted action is further, and still further, delay. Such delay can only serve to increase the difficulty already attendant upon the pending separation of this youngster from his adoptive parents. Equally as important a concern, however, is the avoidance of any unnecessary delay in the unification of this child and his natural parents and his assimilation process into his birth family.

For these reasons, I concur in the denial of the petition for rehearing.

JUSTICE McMORROW, dissenting from the denial of the petitions for rehearing:

I vote to allow the petitions for rehearing. I believe that the petitioners should be afforded another opportunity to present further argument on the specific legal and factual errors they believe this court has made in its decision. I am acutely sensitive to the future well-being of the young boy in the instant case and the trauma which may be visited on him by this court's ruling. The lengthy period of time it has taken for his case to travel through the court system has exacerbated the complexity of the issues involved.

Issues that form the basis of my vote to allow the petitions for rehearing include: the extent of the court's duty to protect children when that protection may conflict with parental rights established by law; the propriety of the court's disregarding laws designed to prevent the taking of a child from biological parents where the evidence of parental unfitness may be

insufficient but where the best interests of the child call for such separation; whether the broad policy statement in the Adoption Act concerning the best interests of the child should be interpreted as predominant over the articulated requirements of the Act; and whether which, if any, of the courts involved in this case misapprehended, unduly emphasized, or attached inappropriate credibility to certain evidence presented at trial. Further argument on these matters would be helpful.

I authored a concurring opinion in this case, joined in by two other justices, which analyzed the existing statutory, constitutional, and case law that applies to the case at bar. Irrespective of the court's liking or agreement with that law, the court is duty-bound to follow that law. Under that law, parental unfitness must be proven *by clear and convincing evidence before* the court can proceed, in an adoption hearing, to a consideration of any other issue. Whether use of the parental rights doctrine, rather than the best interest of the child doctrine, as a standard in child adoption proceedings is realistic is a policy matter for legislative—rather than judicial—consideration.

If a child has lived in a particular home for a significant period of time, courts may desire to permit the child to remain in that home, notwithstanding any other factor. However, as indicated, the courts are required to follow the existing laws of this State regarding the termination of the biological parents' interests. The authority to amend existing statutory provisions that may be improvident is vested in the legislature, not the courts.

Notwithstanding these limitations, I believe that the petitioners should be permitted the opportunity, if they are able, to establish reasons why the judgment of the court was erroneous, under existing law. In my opinion, this court should grant the petitions for rehearing and

carefully scrutinize the arguments presented, to eliminate the possibility that any material aspect of this appeal has been incorrectly decided. Therefore, I dissent from the denial of the petitions for rehearing.

JUSTICE MILLER joins in this dissent.