KOGAN, Justice,
concurring in part, dissenting in part.
I must begin by noting that this case involves a putative father not married to the biological mother, a major distinguishing fact. Florida law presumes that a man married to the biological mother is in fact the legal father of the child, based in part on the child’s interest in legitimacy. Department of Health & Rehabilitative Servs. v. Privette, 617 So.2d 305 (Fla.1993). A corresponding enforceable duty arises for the legal father to support the child. But unwed fathers enjoy no such presumption and owe no automatic duty of support to the child.[2] In a real sense, the unwed father’s interest with respect to the child is less certain than that of the legally recognized father. It is this uncertainty that is the focus of this case; and the difficult nature of this uncertainty cannot *972 be understood apart from its historical development.
Until quite recently unwed fathers were regarded as having few if any rights with respect to their offspring. That situation did not substantially change until the United States Supreme Court issued its 1972 opinion in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). See Robin Durocher, Balancing Competing Interests in Postr-Placement Adoption Custody Disputes: How Do the Scales of Justice Weigh the Rights of Biological Parents, Adoptive Parents, and Children?, 15 J.Legal.Med. 305 (1994); Lynn Kirsch, Unwed Fathers and Their Newborn Children Placed for Adoption: Protecting the Rights of Both in Custody Disputes, 36 Ariz.L.Rev. 1011, 1013 (1994). The Stanley opinion revolutionized the law in this area by recognizing a due process right biological fathers possess with respect to their offspring, though the extent of this right has remained clouded with doubt to the present day.
Indeed, American law on this question is most notable today for its confusing nature. It is clear that the law now at least gives the unwed father a chance to be heard prior to the adoption, but beyond that, little is certain. In broad terms the national controversy now involves two competing approaches, along with variations of them. These are: (1) the “biological rights” standard, which places heavy emphasis on the rights of genetic parents; and (2) the “best interests” standard, which tends to favor the “psychological parent” — the adult who has created a stable home environment and whom the child thus has psychologically come to view as its parent. Kirsten Korn, The Struggle for the Child: Preserving the Family in Adoption Disputes Between Biological Parents and Third Parties, 72 N.C.L.Rev. 1279, 1316-20 (1994). These two standards each have strong and weak points and can be applied in varying ways, but each is generally exemplified in two similar and highly publicized cases.
The first ease involved a child popularly known as “Baby Jessica,” who had been put up for adoption by her natural mother shortly after her birth on February 8, 1991. The mother initially had listed another man as the natural father, but nine days after the adoption petition was filed she had a change of heart and identified the actual biological father. The latter promptly challenged the adoption. After months of legal complications, the Iowa Supreme Court ultimately held that the biological father’s rights had not been terminated and that Baby Jessica thus was not available for adoption. The Iowa Court in particular noted that it could not apply a “best interests” standard, even though Jessica’s interests might best be served by remaining with the only family she had known for the first years of life — her potential adoptive parents. In re B.G.C., 496 N.W.2d 239 (Iowa 1993).
The best-interests standard was exemplified by an Illinois appeals court case involving a child widely known as “Baby Richard.” The mother in this case had refused to disclose the identity of the biological father, apparently out of concern he might veto the placement. When the father learned of the child’s existence, he quickly challenged the adoption. The intermediate appellate court focused extensively on a “best interests” standard in determining that the child was the real party in interest and that his interests demanded he stay with the only parents he had known — his adoptive “psychological parents.” In re Petition of Doe, 254 Ill. App.3d 405, 194 Ill.Dec. 311, 627 N.E.2d 648 (1993). The Illinois Supreme Court, however, reversed after applying the “biological rights” standard used in Iowa. In re Doe, 159 Ill.2d 347, 202 Ill.Dec. 535, 638 N.E.2d 181 (1994), cert. denied, — U.S. -, 115 S.Ct. 499, 130 L.Ed.2d 408 (1994). Baby Richard thus was placed with his biological father after spending roughly the first three years of life with another family.
It is well worth noting at this point that the United States Supreme Court has denied appellate review in both the Baby Jessica[3] and Baby Richard cases,[4] thereby leaving *973 intact court orders returning these children to their biological parents.
One of the more recent pronouncements on this topic is the 1994 revision of the Uniform Adoption Act (“UAA”) promulgated by the highly respected National Conference of Commissioners on Uniform State Laws. The UAA has combined the two standards in an interesting way: Upon challenge to the adoption of a child less than six months of age,[5] petitioners must establish (1) by clear and convincing evidence a ground constituting abandonment (which may include evidence of prenatal abandonment) or, alternatively, that the father has been convicted of certain crimes,[6] or is not the legal, adoptive, or genetic father of the child, and (2) by a preponderance of the evidence that termination is in the best interests of the child. Once this is done, the burden then shifts to respondent to rebut, including proving by a preponderance of the evidence a compelling explanation why any abandonment occurred (such as poverty, deception by the mother, and so forth). If the respondent presents such proof, the burden then shifts back to the potential adoptive parents to establish one of four factors that would weigh in favor of terminating parental rights, including further consideration of the child’s best interests. Unif.Adoption Act, § 3-504 (1994).
The UAA includes the following commentary:
[A] respondent father’s rights may be terminated on the basis of his behavior prior to the minor adoptee’s birth, including a failure to manifest an ability or willingness to assume parental duties, unless he can prove a “compelling reason” for his failure. State courts have found it constitutionally permissible to terminate a father’s status for pre-birth “abandonment” of an unwed mother whom the father knew was pregnant.
9 U.L.A 5, 55 (1995 Supp). As authority, the UAA cites our opinion In re Adoption of Doe, 543 So.2d 741 (Fla.1989). In this sense, the UAA language may only be as solid as our earlier opinion: The United States Supreme Court still might reject this view in a future case.
While the UAA obviously has not been adopted in Florida, it nevertheless represents a considered view by noted scholars. And its attempt to combine the two competing standards into a single analysis suggests a very important point: that both may actually have some relevance to these cases.
This last conclusion also finds support in opinions of the United States Supreme Court. In 1983, for example, the Court found that unwed putative fathers possess only what may be called an “opportunity interest” in establishing legal fatherhood. Like the UAA, the Court used an analysis suggesting that the best interests of the child may factor into the equation whenever an adoption is challenged, although the emphasis here is somewhat different:
“[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in ‘promoting] a way of life’ through the instruction of children ... as well as from the fact of blood relationship.” Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109-2110, 53 L.Ed.2d 14 (1977) (quoting Wisconsin v. Yoder, 406 U.S. 205, 231-233, 92 S.Ct. 1526, 1541-1542, 32 L.Ed.2d 15 (1972)).
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child’s future, he may enjoy the blessings of the parent-child relationship and make *974 uniquely valuable contributions to the child’s development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child’s best interests he.
Lehr v. Robertson, 463 U.S. 248, 261-62, 103 S.Ct. 2985, 2993-94, 77 L.Ed.2d 614 (1983) (emphasis added) (footnotes omitted).
These statements are important, first, because they indicate that the unwed putative father has merely an inchoate right to establish legal fatherhood, which he may exercise or neglect as he sees fit.[7] Second, they suggest that the father’s “opportunity interest” matures into a due process right if he “accepts some measure of responsibility for the child’s future.” Third, the quoted material also indicates that the “child’s best interests” are to some degree relevant.[8] This is so, the Court indicated, because society’s interest in the establishment and support of a stable home environment for the child deserves consideration along with the interests of blood kinship. The Lehr Court regrettably was silent as to how we should balance “best interests” against kinship rights when the two are in irreconcilable conflict, as they are here.
One clue as to the Court’s thought on this last matter was provided in an opinion issued by Justice Stevens in his capacity as Circuit Justice reviewing a stay petition in the Baby Jessica case. DeBoer v. DeBoer, — U.S. -, 114 S.Ct. 1, 125 L.Ed.2d 755 (1993). This opinion is of uncertain precedential value because of its peculiar status as the solitary view of Justice Stevens. Nevertheless, I think we cannot ignore the fact that the full Court has not disputed Justice Stevens’ analysis.
In DeBoer, Justice Stevens denied a stay application from the potential adoptive parents of Baby Jessica, who by then had been ordered to return the child to her natural parent. In rejecting that petition, Justice Stevens made the following pertinent remarks:
Neither Iowa law, Michigan law, nor federal law authorizes unrelated persons to retain custody of a child whose natural parents have not been found to be unfit simply because they may be better able to provide for her future and her education. As the Iowa Supreme Court stated: “[Cjourts are not free to take children from parents simply by deciding another home appears more advantageous.” In re B.G.C., 496 N.W.2d 239, 241 (1992) (internal quotation marks and citation omitted).
Id. at-, 114 S.Ct. at 2. The present case obviously can be distinguished because the trial court below found a prenatal abandonment. Yet I cannot ignore the clear implication of Justice Stevens’ opinion: that the rights of biological parents cannot be ended lightly, and especially not because of factors that reflect more on socioeconomic status than fitness to parent.
While the relevant law plainly is unsettled, the discussion above reveals enough to leave me with considerable doubt about the majority opinion. By the same token I am not convinced that the fairly complex best-interests analysis used by the UAA entirely squares with what the United States Supreme Court has told us about these cases.[9] Justice Stevens’ remarks in DeBoer — which can be harmonized with cases announced by the full Court — imply that great weight must be given to the biological father’s opportunity interest, at least on facts similar to those in the Baby Jessica case. I take this to mean *975 that the best interests of the child will seldom defeat a timely and legally sufficient challenge by the biological father made before or shortly after the child’s birth, as happened with Baby Jessica.
Nevertheless, Lehr teaches that the child’s best interests at least sometimes will be relevant. And I think that psychological and legal concerns as well as simple fairness compel this same conclusion. In Privette, for example, we ourselves noted an overriding policy concern in a similar context:
It is conceivable that a man who has established a loving, caring relationship of some years’ duration with his legal child later will prove not to be the biological father. Where this is so, it seldom will be in the children’s best interests to wrench them away from their legal fathers and judicially declare that they now must regard strangers as their fathers. The law does not require such cruelty toward children.
Privette, 617 So.2d at 309. While Privette is distinguishable because the father there had legally recognized parental rights, it nevertheless indicates a major point: The passage of time factors into this equation in an important way. Biological parents, in other words, must assert their rights early in the child’s life.
The most reasonable interpretation of the various cases described above is that the child’s best interests become more relevant as the period of time increases between the child’s birth and the date the biological father’s legal challenge is filed. And this in turn implies that there is an early period during which the child’s best interests are less relevant absent some unusual factor. This period precisely corresponds with the time during which the biological father must act upon his opportunity interest or forever lose it. In other words, challenges made very early in the child’s life will be gauged more by the “biological rights” standard, but the standard then will shift toward a “best interests” analysis as time passes. As we said in In re Adoption of Doe, 543 So.2d 741, 744 (Fla.1989):
[Tjhere may well be circumstances where a natural father does not acknowledge or declare a parental interest in the child until after the child has been with the adoptive parents for a significant period of time during which substantial bonding has occurred. In such a case bonding would be a material consideration on the issue of abandonment.
I agree wholeheartedly that bonding is relevant. In light of Doe, I do not find the majority opinion inconsistent with the general analysis I am outlining here; and to that extent I concur with the majority.
In the interest of more certain application, I think it reasonable to fix a point in time at which the child’s best interests first become relevant in the normal case. The six-month postnatal period suggested by the UAA is reasonable and not inconsistent with the Florida statute, and I therefore would adopt it as the demarkation point. Thus, for challenges made by a biological father less than six months after birth, the best interests of the child will have only minimal if any relevance. For challenges made more than six months after birth, I believe the best interests of the child would then become a relevant factor, weighing more heavily with the trial court as the child bonds with its adoptive family. A point would soon be reached where the child’s interest in remaining with its “psychological parents” would become so compelling as to wholly defeat any countervailing interest the biological father has.
This approach has a number of benefits that better harmonize the relevant authority both with itself and with what we know of child psychology. In the law it is axiomatic that one who sits on his rights forfeits them, and this is no less true of biological fathers with respect to their offspring. A biological father who does not assert his opportunity interest soon after birth simply cannot be equated with one who does. The Fourteenth Amendment’s due process clause provides many protections, but these do not include a “second chance” to invoke a lapsed right.
Likewise, a six-month demarkation point would better minimize the risk of psychological harm to the child. During the first six months of life the child is less cognitively aware, but after six months the child’s ability to intelligently perceive and emotionally *976 react to its surroundings and caretakers grows rapidly. As the child becomes older it soon identifies its caretakers as parents, bonding with them. As this bonding increases, a psychological family soon comes into being.[10] Of course, expert testimony on this point would be admissible evidence; and the child’s best interests should weigh more heavily to the degree it has psychologically bonded with its caretakers.
Yet another legal problem must be addressed, and it is one that I think reflects unfavorably on the way the courts are handling these eases. The typical pattern we see in all the adoption cases discussed above is that the mother gives the child for adoption, the child is placed with its potential adoptive parents, and the biological father promptly challenges the adoption. For both legal and psychological reasons, I seriously question the validity of placing the child with its potential adoptive parents despite the biological father’s challenge, even though this seems a common practice. Such action may in fact be unconstitutional, and it certainly contributes to the horrendous psychological damage done to the child when and if it must be returned to the biological parent.
My objection is this: The fact that unwed biological fathers have a constitutionally protected “opportunity interest” in their offspring necessarily implies that they must at least be given the “opportunity” to exercise it, absent adequate proof of prenatal abandonment.[11] This in turn means there must be a period of time after birth during which such a biological father has a right of access to the child. This might include a tentative placement with the biological father or some kind of visitation rights, depending on the facts before the trial court. Visitation by the potential adoptive parents also may be permissible. In some situations, the child could be placed in a neutral foster arrangement with visitation by both the potential adoptive parents and the biological parent.
It deserves emphasis here that the unwed biological father’s constitutional interest over the child is not fully formed at this stage and therefore can be subjected to such reasonable restrictions or limitations. His rights are simply not as extensive as those of a legally recognized father. During this period, the state also could evaluate the unwed biological father’s performance and intervene at any time if his conduct required it. The trial court then could finalize the case, allowing the adoption if the father fails to adequately exercise his opportunity interest. Once again, I think six months would be a reasonable period of time for this evaluation to occur, based on the same reasons noted above, though some flexibility should exist for special cases. The overriding goal would be to settle the matter quickly so as to minimize harm to the child.[12]
Beyond its legal and psychological benefits, the procedure outlined above also has obvious benefits for the parties and the child. It permits a reasoned evaluation of any unwed father whose prenatal conduct — while not constituting an actual abandonment — has been validly questioned. This avoids defining “prenatal abandonment” so overbroadly that it impinges upon the father’s constitutional opportunity interest. The procedure also does not place the potential adoptive parents in the heart-rending position of becoming emotionally invested in a child they may not receive; and it could finalize the matter earlier in the child’s life, before emotional scarring is likely to be serious.[13] *977 Moreover, it leaves the child with “fallback” adoptive parents in case the father’s postnatal conduct genuinely does not meet legal requirements. While the potential adoptive parents may find this “tentative” status unsettling, it is far better than parting them from a child they have kept for months or years.
Many conclusions flow from the above analysis. First, it leads me to disagree with the majority’s interpretation of section 63.032(14), Florida Statutes (Supp.1992), which I fear extends state law into the realm of the unconstitutional. I do not propose that the prenatal “conduct of [the] father toward the child’s mother” is irrelevant evidence, but merely that it is relevant solely to the extent it demonstrates abandonment of the child. This is the only view that harmonizes the statute with case law and hence with the Fourteenth Amendment. The very fact the Supreme Court has recognized the biological father’s “opportunity interest” necessarily means he must at least be given that opportunity if he has sincerely expressed interest in exercising it. And this would be true even if the biological father and mother have irreconcilable differences. Absent conduct detrimental to the fetus, hatred of the mother does not necessarily imply hatred of the child.
Moreover, I am entirely unwilling to say that purely prenatal conduct ever can demonstrate abandonment with respect to the child absent clear and convincing proof that the biological father either (a) unequivocally, by word or deed, indicated a complete and unconditional prenatal abandonment of the child upon which others have reasonably relied,[14] or (b) recklessly or intentionally engaged in conduct that posed a significant risk of detriment to the fetus above and beyond what may be attributable to simple lack of socioeconomic resources. In the absence of such evidence I believe the father must be given a postnatal chance to exercise his opportunity interest under any appropriate supervision that may be necessary.
Turning now to the facts, I think the present record demonstrates more than amply that the biological father had assumed “some responsibility” (in keeping with Lehr) for this child’s future, and also that he had indicated a desire to exercise his opportunity interest. At least four facts demonstrate this: (1) he paid part of the couple’s joint living expenses when they lived together;[15] (2) the father promptly and prenatally informed the attorney-mediator he would oppose the adoption and seek legal rights to the child; (3) the father attended one of the mother’s visits to a health-care provider during her pregnancy;[16] and (4) the father purchased a crib for his baby.[17]
Thus, we have a biological father here who clearly had shown at least some prenatal interest in the child. Evidence supporting prenatal abandonment — including all of that cited by the trial court and the majority — is at best equivocal and therefore uncompell- *978 ing.[18] Nothing in the record indicates any conduct on his part likely to be detrimental to the fetus apart from his poverty, even though I acknowledge his interpersonal skills with respect to the mother were lacking. Moreover, he was denied meaningful postnatal access to the child by a series of events beyond his control, including an unlawful ex parte order waiving his veto rights and a court injunction. Consistent with federal case law, I believe the trial court erred in initially placing the child in the exclusive custody of the potential adoptive parents based on the record before it. Instead, an arrangement should have been made for the biological father to have access to the child for purposes of exercising his opportunity interest.
I cannot overlook the terrible consequences that now have flowed from the trial court’s initial error. The record before us poses an unambiguous nightmare: potential adoptive parents who have had custody of the child for years and are emotionally invested in her, a little girl who knows no one else as her parents, a father whose rights were improperly terminated and who has had no opportunity to bond with his child, and a lawsuit that leaves this Court with nothing but sickening choices. Worse still, the record before us is sufficiently equivocal that I might have been inclined to relinquish jurisdiction for a proper and expedited determination in the trial court under the analysis I have set forth here, except for the case’s odd posture. Sadly, relinquishment is pointless now, because the first six months of the child’s life are over and she already has bonded with her potential adoptive parents. Because the biological father was unlawfully denied access to his child from her birth and soon thereafter filed this challenge, the only remedy is to return her to him.[19]
I must voice another concern. The majority opinion goes to some pains to stress that both financial and emotional abandonment combined are dispositive here. I do not find that the record sufficiently supports financial abandonment, since the facts it contains as well as those recited by the trial court are entirely consistent with a couple living in poverty. I am utterly unpersuaded by the “finding” that the mother was “supporting herself’ because she paid half of the couple’s joint expenses. I heartily doubt that any court would say an unwed professional father earning $50,000 a year has abandoned his unborn child merely because the mother also earns $50,000 and they equally divide living expenses. How, then, is the situation different when both merely earn a few hundred each month?
Unexamined assumptions can be a poison lurking in the midst of judicial opinions. And the assumption I find here is that an unwed father who lacks means has fewer rights than one with money. By any standard, poverty cannot equate to abandonment. Otherwise our society effectively would claim the right to take children away from the poor, which would constitute an appalling perversion of the law.
As to the second factor, I find the lack of emotional support toward the mother to be a very slim reed on which to hang a legal doctrine that forever parts father from child. This conclusion is all the more compelling where, as here, the trial court’s own order contains findings showing that this father assumed some responsibility for the child’s future — which is all the Supreme Court appears to have required. And I am even more uneasy when the evidence actually supporting the trial court’s findings is seriously conflicting and not necessarily relevant, as it is here.
In all candor, I also must add that this is a conclusion in which I find no joy. However much we dance through the hoops of legal doctrine, the bitter fact remains that this is a case about a small child named Baby Emily. *979 With that image in mind, I cannot suppress a sense of abiding outrage at what our legal and governmental system has done to her. She was born August 28, 1992, and even today her legal fate is not finalized. For some three years she has known only one family — that of the potential adoptive parents — yet her biological father’s rights over her have not been satisfactorily ended, at least to my mind.
In a real sense, the most victimized party here is the child. Where does the fault lie? — It rests on inadequate laws, procedural rules incapable of recognizing the needs of a small growing child, state agencies too unmindful of the biological father’s rights, parties too eager to litigate, judges and lawyers who let the child’s fate bog down in a quagmire of legal technicality. We all have failed Baby Emily. And while I wish the law could magically rescue her from the legal conundrum in which she lies, I see no solution that is free of tragedy. Taking her from her psychological family unquestionably will scar her, as the record itself indicates. Such a result can only be described as horrible.
Yet leaving Baby Emily with her adoptive family will set a precedent I find damaging to our society’s traditional concept of a family based on blood kinship — something the nation’s highest Court has clothed with significant legal protections. Our decision today may well reverberate for years to come in countless other adoptions, affecting many other biological fathers. And I genuinely believe that a concept like “lack of emotional support of the mother” can too easily lead to abusive applications selectively discriminating against the less fortunate, in favor of the privileged. This is a broader and more insidious impact that I find even more horrible for a very basic reason: It suggests that the well-to-do can come to Florida to shop for babies among an underclass unschooled in vaguely defined middle-class values underlying a concept like “emotional support.”[20]
All of this points only to a single indisputable conclusion: There is a pressing need for reforming the way these cases are handled, at least to lessen the delays and the damage they bring to children. I personally urge the Family Law Rules Committee of The Florida Bar and the Florida Legislature to study possible methods of expediting review of disputes between biological and adoptive parents.[21] Clearly the present framework in which the courts operate is worsening the problem through long and largely pointless delays only too well demonstrated here.[22] We can only guess how this case might have ended had the issues been resolved quickly. But there can be no doubt this Court would not have faced so terrible a choice as it must make today: to select between hurting a helpless child or further eroding the institution of the kinship family. Because the latter is the greater evil, I dissent as to the result. But I must add that returning Baby Emily to her biological parent at this late date is an image that would haunt me for my remaining days.

. Such a duty could be established in a paternity suit.

.DeBoer v. DeBoer, - U.S. -, 114 S.Ct. 1, 125 L.Ed.2d 755 (1993).

. Baby Richard v. Kirchner, - U.S. -, 115 S.Ct. 499, 130 L.Ed.2d 408 (1994); O’Connell v. Kirchner, — U.S. -, 115 S.Ct. 1084, 130 *973 L.Ed.2d 1054 (1995); Doe v. Kirchner, - U.S. -, 115 S.Ct. 2599, 132 L.Ed.2d 846 (1995).

. A slightly different standard applies if the adoption is for a child greater than six months of age.

. The UAA defines these as “a crime of violence or of violating a restraining or protective order, and the facts of the crime or violation and the respondent's behavior indicate that the respondent is unfit to maintain a relationship of parent and child with the minor[.]” Unif.Adoption Act, § 3 — 504(c)(3) (1994).

.While it may be true that the unwed father must perform additional acts to establish his legal claim to the child, such a statement perhaps erroneously suggests that biological fathers enjoy no presumption with respect to the child. I believe the biological father does in fact enjoy a presumption that he has validly exercised his opportunity interest until such time as the parties seeking adoption meet their burden of proving otherwise. I find this the only view that squares with the United States Supreme Court’s pronouncements on this question.

. However, it is true that the Court apparently has declined to precisely consider whether a due process interest arises between children and their foster parents of long duration. Smith v. Organization of Foster Families, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977).

. By this, I mean the fact that the UAA seems to say that best-interests evidence is relevant whether or not the father challenges the adoption before or after the first six months of the child's life.

. This in part explains why the "best interests” standard — which incorporates the notion of the psychological family' — is less relevant in early life. Where no psychological family has formed, the standard is not usually relevant absent unusual factors.

. My views on what constitutes proper prenatal abandonment are discussed below.

. Obviously, the Legislature would be within its authority in prescribing guidelines for the exercise and evaluation of the biological father's "opportunity period.”

.There remains the problem, however, of protracted appeals. Given present constitutional constraints, there is no satisfying solution, although there is the possibility that some such cases could be taken directly to this Court by way of a habeas corpus petition. See State ex rel. Cline v. Cline, 91 Fla. 300, 107 So. 446 (1926). Of course, habeas cannot substitute for an appeal, Adams v. Culver, 111 So.2d 665 (Fla. 1959), but modifications to procedural rules or the ha-beas corpus statute might lessen this problem.

. This essentially is an estoppel concept.

. The record contains canceled checks that establish this fact. I frankly find the trial court's order disingenuous on this point when it states that, by paying half of the living expenses, the mother in effect was "paying her own way.” Simple common sense dictates that two can live more cheaply than one, so the mother and her unborn child in fact received some financial benefit from the joint living arrangement. The facts indicate the couple were impoverished, but poverty alone clearly is no lawful reason to take a child from a natural parent.

. The trial court made much of the fact that the father was described as “an ice cube" during this visit. Given the stoicism inherent in the American ideal of masculinity, I frankly am surprised that such opinion testimony would be deemed relevant here. Being emotionless during a gynecological visit may indicate something sinister, or it may only indicate a nervous man trying to hide his own discomfort. I think we must be very cautious when events with multiple interpretations are used to demonize in this manner.

.Again, the trial court faults the father for using money from his mother to buy the crib. I would only note that it is very common for grandparents to make contributions of this kind, especially to an impoverished couple. The fact remains that the money was in the father’s possession, he could have spent it however he wished, yet he chose to purchase a crib for his baby. I again must voice my fear that this father is being stripped of his parental rights in part because he is impoverished.

. The primary piece of evidence is the mother's assertion that the biological father told her to "do what you have to do" when she said she wanted to place the child for adoption. This utterly ambiguous evidence is severely undercut by testimony from the biological father and the attorney-mediator. The latter even said that the former expressed his desire for the child in strong terms.

. This would not necessarily be true had the biological father's challenge been made more than six months after the child’s birth, under the analysis developed above.

. What may seem like sufficient "emotional support” to one judge may well utterly fail in the eyes of another. Looking back to the depression earlier in this century, I think a substantial number of American men provided less emotional support than did this father, because of the exigencies of widespread poverty. It takes little imagination to see other problems that can arise in the years ahead. If the father is away on military duty, for example, he well could be deemed to be providing insufficient emotional support — although military men at least have some protection afforded by the federal Soldier’s & Sailor's Civil Relief Act. The majority is treading too far out onto a very slippery slope, thereby creating fertile soil for future lawsuits that can only harm the children who lie at the center of these controversies.

. Lawsuits of this type cry out for at least four broad reforms: (1) expedited review in the trial court; (2) expedited appeal; (3) swift and certain finality of court decisions; and (4) reasonable mechanisms to minimize psychological harm to the child during the legal process.

.One commentator has aptly noted that
the law must impose some outer time limit on the father and the court process. If the father learns of the child and comes forward relatively quickly, and the court hears the case (and any appeals) expeditiously, the risk to the child can be minimized. In addition, the court could require interim visitation with the biological father to enable him to develop a relationship with the child.
Deborah L. Forman, Unwed Fathers and Adoption: A Theoretical Analysis in Context, 72 Tex. L.Rev. 967, 1039-40 (1994) (footnote omitted).