411 So.2d 1380 (1982)
In re the ADOPTION OF M.A.H., a Minor Child.[1]
No. 80-1159.
District Court of Appeal of Florida, Fourth District.
April 7, 1982.
*1381 Sharyn D. Garfield of Law Office of Chesley V. Morton, Fort Lauderdale, for appellant.
Charles R. Forman of Gill & Forman, Ocala, for appellee.
LETTS, Chief Judge.
The paternal grandparents, age 52, here protest the denial of their petition to permanently adopt their 5 year old granddaughter. The natural father consented, but the natural mother, age 26, to whom the child was born out of wedlock, opposed the adoption although she herself had been found by the court ordered Health & Rehabilitative Service's (HRS) investigation to be an unfit mother incapable of assuming responsibility for the child "at this time nor in the foreseeable future." We reverse.
This is a tragic tale perhaps complicated by the fact that, because of the circumstances and through no fault of those instrumental to the outcome, four different judges and at least three counselors from HRS have handled bits and pieces of this situation.
In the beginning, when the child was but two years old, HRS placed her in its emergency shelter and shortly thereafter, in October of 1977, temporary custody of the child was, by court order, officially given to the paternal grandparents. With only a few interruptions, they have had physical, though not official, custody since the child was six months old. The mother has never protested this custody and does not do so now. It is only the adoption that is opposed.
As the natural mother's counsel concedes in her brief, the mother has a long history of drug related emotional problems and since April of 1978 has never attempted to directly contact the child, or the child's grandparents, up to and including the date of the hearing on the adoption in June of 1980, a period of over two years. The only attempts at contact were the sending of Christmas presents one Christmas in 1979, (which were never received[2]) and several telephone calls or letters to HRS officials in which she expressed interest in the child and hopes for visitation.[3] Moreover, at a November, 1977, hearing the judge ordered the mother to pay $7.00 a week towards the child's support which she totally failed to do except for one lump sum payment of $48.50 made in 1978 to avoid being held in contempt. Her arrearages at the time of the adoption hearing amounted to $7.00 a week for some 130 weeks, the last 116 weeks of which had produced no contribution whatever.
There is, however, conflict regarding her ability to make support payments. The mother has been unemployed, and has changed jobs and locations several times while battling her emotional, psychological and drug problems. Nonetheless, we have read every word of the record for ourselves and find, according to the mother's own testimony for example, that for the entire year preceding the adoption hearing she worked steadily for one employer, earning up to $240 per week gross. At no time during that period did she send as much as one penny of the court ordered support.
We would comment that our litany of the natural mother's shortcomings is not set forth to make her look bad, for we recognize that she has endured and continues to *1382 endure severe problems.[4] Rather we recount them because the legislature requires a showing of abandonment and our Supreme Court in Wiggins v. Rolls, 100 So.2d 414 (Fla. 1958), denied an adoption request because the following factors negated an abandonment by the non-consenting parent who: (1) consistently showed affection for the child, (2) furnished regular funds for support and maintenance, (3) maintained as close a contact with the child as circumstances could permit, (4) remembered her with gifts on holidays, birthdays and at Christmas time, (5) wrote regular letters, and (6) came from New York each summer during vacation to visit the child.
By contrast, the non-consenting parent here has done none of these things except for never received Christmas presents one Christmas and a few contacts with HRS. Moreover for the two years preceding the adoption hearing it was not New York that she failed to come to Broward County from for a visit, but rather Ocala, Florida.
Finally, to complete enough of a factual dissertation necessary to support our conclusion, the HRS evaluation furnished for the adoption hearing, said of the grandparents:
It is clear that the petitioners enjoy a warm, loving relationship with their granddaughter and have provided her with good care in pleasant surroundings. They have adequate income and resources to provide for her needs.
Concluding that same evaluation however, the HRS report gave two reasons for opposing the adoption:
In the opinion of the undersigned counselor, the best interests of [the child] would not be served by granting this petition, for the following reasons:
1. Through adoption ... the child would lose forever her maternal heritage, her right to visit and know and love and be loved by her natural mother. This is not the case with her natural father, who, although he has given his consent to the adoption, will still have access to the child.
2. Adoption by the petitioners will result in no additional benefits to [the child]. Her living situation will remain as it has been for the last 32 months. Her paternal grandparents will continue to provide for her physical, emotional and spiritual needs.
Both from an examination of the applicable statute[5] and this court's decisions in The Matter of the Adoption of Serpe, 395 So.2d 1240 (Fla. 4th DCA 1981) and in The Matter of Adoption of Noble, 349 So.2d 1215 (Fla. 4th DCA 1977) it would appear (as this trial judge expressed it at the adoption hearing) that the sole question absent consent is:
Did the mother abandon the child?
We agree, but it was not always thus and in the end this is not the basis on which this judge made his decision. Prior to 1973, the Florida Statute did not require the parent to have "abandoned" the offspring and indeed it spoke to "the best interests of the child." Section 72.20, Florida Statutes (1955). However, our no doubt well intentioned legislature has orchestrated the new statute to specifically negate the child's best interests and make the adoption, without consent, subject only to abandonment.[6] Thus the comforting words of Wiggins v. Rolls, supra, "that the courts will always consider first and primarily the welfare of the minor," have been superceded. Id. 100 So.2d at 416. This is hard to accept. In matters relating to children it appears that the best interests of a child are always at least considered in all facets of the law. Yet in that most sensitive of areas, adoption *1383 of minor children, the legislature has seen fit to jerk the rug out from under us.[7] (See Nelson v. Herndon, 371 So.2d 140, 141 (Fla. 1st DCA 1979) and Solomon v. McLucas, 382 So.2d 339 (Fla. 2d DCA 1980), cert. den. 389 So.2d 1112 (Fla. 1980). We are thus required, on a case by case basis, to decide what constitutes abandonment.
Significantly, the confidential report and testimony by HRS concludes that the mother has not abandoned the child for two reasons.
1. The undersigned counselor has had several phone calls from [the mother] at various times over the past year in which she expressed a desire to visit M.A.H. Although to the counselor's knowledge she never followed through with her plans.
2. An ongoing theme of ill will between the [grandparents] and the [mother] and [resulting] difficulties in effecting visitation.
Frankly, we are of the opinion that a mother should not be able to escape a finding of abandonment under the facts of this case. No claim was made in the record that the absence of attention was attributable to illness or emotional problems, other than the recitation that she suffered from them. For all practical purposes, the mother has abandoned this child. Intermittent contacts with HRS, of which the child is not even aware, cannot and did not furnish one iota of benefit physically, spiritually, economically or emotionally. Nonetheless our role on the appellate level must be to reverse only when there is no competent substantial evidence to support a finding of no abandonment and we are required to refrain from doing so merely because we disagree. However, the finding here was only that of HRS and we are firmly of the opinion that the trial judge's final order was not based on a finding of no abandonment. The actual written order gives no reason for the denial of the petition but the last words spoken by the judge were:
I want the parties to know that it is going to be very difficult for me all the way around, but then, that's my job. I have to do what I think is in the best welfare of the child. That's the way the Courts have ruled, and you all sure got tangled up. Anyway, I will try to give this as prompt a decision as I can. (emphasis supplied).
We sympathize and agree with his thought process but it is apparently not the law and he was demonstrably influenced by the HRS report (which said the adoption would not be in the child's best interests) by announcing from the bench that those best interests would from the basis for his decision.
As we have said, the legislature has apparently precluded the courts from considering the best interests of the child in so far as a non-consenting natural parent is concerned. Obviously, when it comes to actual adoption, as distinct from custody, the HRS must operate under the same statutory limitation and consider the best interests of the child only in so far as the adoptive home is concerned. The suitability of the adoptive parents was considered here and they were found to have provided "a warm, loving relationship ... with good care in pleasant surroundings." However, HRS also considered the best interests of the child in the light of her relationship with her non-consenting mother, and it was this latter consideration which was improper under the statute.
Thus, while we repeat our dissatisfaction with the legislature's action, we have no doubt that the thrust of the HRS report and the attendant testimony is based on an impermissible premise which requires us to reverse this case and remand it for a new evaluation and a further hearing. Who knows what intervening factors may affect a fresh consideration of this matter? In any event, though we deplore it, the best *1384 interests of the child is not one of them when the natural parent will not consent.
One final comment on the HRS report: stability and permanency in love, affection and responsible care, must constitute the gravamen for the emotional security necessary to ensure the successful upbringing of any child. In this case, in no small measure because of the HRS finding that the mother will not be capable of assuming responsibility for the child in the forseeable future, the love, affection and responsible care has come, and for the balance of childhood, will come, from the grandparents not the parents. HRS concludes that the grandparents already have custody and that adoption will provide no additional benefits. We must respectfully disagree. The present legally granted custody is only temporary and thus ever vulnerable to change. At some point in time, custodial parents must earn the right to claim a child permanently, lest they discharge their duty with something less than completeness or worse yet, throw up their hands and abandon their efforts for the sake of their own emotional well-being.
REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT HEREWITH.
BERANEK and DELL, JJ., concur.
NOTES
[1] We have used only the child's initials in the style of this case in accordance with Section 63.162(3), Florida Statutes (1979).
[2] The mother testified at first that her mother took the presents and that they were returned. However, she later changed her story to reflect she actually sent them by bus and doesn't know whether they were delivered or not.
[3] She actually had received from the court liberal visitation rights which she never sought to exercise after moving to Ocala in April of 1978.
[4] So far as we can see from the record the father has been every bit as sorry a parent, a fact which he candidly conceded at the adoption hearing.
[5] Section 63.072(1), Florida Statutes (1979).
[6] The preamble to the new statute entitled "Legislative Intent" does address the "well being of the person being adopted" but this general language in Section 63.022(1) is obviously overwhelmed by the choice of words in Section 63.072(1).
[7] It is we hope obvious that the legislature has not excluded the best interests of the child in so far as the required study of potential adopting parents to "inquire into the suitability of the intended adoptive home" Section 63.092(2) is concerned. This opinion addresses itself only to the removal of any consideration of best interests in the situation where one or both of the natural parents will not consent.