FARMER, Judge,
dissenting.
I join in the dissenting opinions of Judge Klein and Judge Stevenson. My primary purpose in writing is to express my disagreement with the en banc majority’s construction that the terms support and conduct in the abandonment statute properly encompass emotional support of the mother.[4] It is apparent to me that this legislation was borrowed from the Juvenile Justice Code, with the holding in In the Matter of the Adoption of Doe, 543 So.2d 741 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), simply tacked on as an afterthought. As a result of this legislative “cut and paste” the statute is anything but clear and definite.
But even if it were a model of clarity, I simply cannot agree that the legislature could properly make the key question— whether an unmarried father has abandoned his unborn child — turn on anything so subjective, idiosyncratic and elastic as “emotional” support of the mother. By definition we are speaking of relationships outside of marriage, where the parties may not even live together, and they disagree on what to do about her expected child. One such mother, in assessing emotional conduct, may view a father’s aloofness during pregnancy as cruel and oppressive, while another mother may view the same conduct in a different man as acceptable reticence. One woman may become distraught and be unable to cope with a man’s loud and repeated verbal attacks, while another woman may react to the same conduct as his customary assertiveness. The point is that there is no measuring device for emotional support, no all-purpose standard, no pervasive test. Emotional tolerances change from time to time within the same person and are constantly different from person to person. There is no uniform code of emotional conduct — within or outside marriage. Hence, such a statutory requirement would fail because of its essential confused uncertainty.
In any event, contrary to the views of the majority, the term conduct in the last sentence of the abandonment statute can only refer back to the essential term support in the first two sentences. This is so because conduct is a general term that has no meaning outside of specific context. No one would reasonably suggest, e.g., that the legislature could provide that a father could lose his *938 child if he were guilty of “conduct.” Such a word must always have a referent in the statute. The essential conduct covered by the abandonment statute is, therefore, not “the entire spectrum of conduct,” to use the majority’s phrase, but the only kind of conduct that the statute itself refers to, i.e. support.[5]
Statutes concerning adoption are in derogation of the common law and must be strictly construed. In re Miller, 227 So.2d 73 (Fla. 4th DCA 1969); Tsilidis v. Pedakis, 132 So.2d 9 (Fla. 1st DCA 1961). Moreover, as the original panel majority opinion in this case pointed out, the United States Supreme Court and the Florida Supreme Court have jointly established the rule that strict scrutiny is customarily given to statutes affecting the fundamental liberty interest in parenthood. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); cf. Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (constitution does not bar a state from allowing the adoption of 2-year old child without notice to the biological father, where the father had no significant custodial, personal or financial attachment to child); In the Interest of R.W., 495 So.2d 133 (Fla.1986). At common law the parental obligation of support of the minor child was limited to the necessaries of life. In re L.G.T., 216 So.2d 54 (Fla. 4th DCA 1968). And even though at common law the father of a child born outside .of wedlock had no rights as to the child, in Florida the courts have recognized that the father of such a child had a preferential right to custody of his natural child. In re Guardianship of D.A. McW., 460 So.2d 368 (Fla.1984) (strong public policy in favor of unmarried natural father having custody of child); cf. State ex rel. Sparks v. Reeves, 97 So.2d 18 (Fla.1957) (biological parent has natural God-given right to custody of child; rule is older than eom-mon law). Moreover, under the adoption statutes before the term abandonment was ever added or defined, the failure of a natural parent to support the child, while relevant, was insufficient itself to justify an adoption of the child over the parent’s objection. Solomon v. McLucas, 382 So.2d 339 (Fla. 2d DCA), rev. denied, 389 So.2d 1112 (Fla.1980).
When a word commonly has both a primary or strong sense, and at the same time also has a different weak or tertiary sense, and the legislature does not expressly state which sense it intends, the usage not being clear in its context, then the statute is at the very least ambiguous. Under strict construction, the definition of the term abandonment must then be construed in favor of the father. It cannot be construed to reach possible secondary meanings that increase the burden on the father to maintain his right to his child. Those who contend in this case that the father abandoned his child by conduct in failing to give emotional support to the mother before birth can succeed only by engaging in a liberal construction of the terms, thereby extending the ordinary meaning of support and conduct to include the possible, additional, weaker meanings. But this is precisely what they are not permitted to do under the rules of strict construction and scrutiny.
Judge Klein has emphasized that the relevant inquiry is whether the father has been clearly and convincingly shown to have abandoned his parental duties, i.e., his duties toward the unborn child. The issue is not whether he was a good cohabitational partner with the mother during her pregnancy. Indeed the only reason that prebirth conduct should ever be considered is to shed light on whether he sought to abandon his incipient duties as a father. The fact that prebirth conduct of the father may be admissible at all, however, cannot become transformed into a rationalization to evaluate how good he was *939 as a helpmate to the mother before the child was born.
But even if the statutory terms could be construed to allow the court to consider emotional nonsupport or abuse as some evidence on the abandonment issue, in my opinion the evidence adduced by appellees on rehearing in the trial court simply did not rise to the level of the clear and convincing standard. Indeed if one aggregates all of the evidence adduced by the adoptive parents and intermediary at both the original hearing as well as the rehearing, excluding the irrelevant evidence about the father’s past, and casts it in a light most favorable to appellees, it doesn’t amount to proof of anything approaching abandonment. It shows two people living together outside of marriage who had simply become unable to stand one another.
The fact that he did not drive her to medical appointments during pregnancy has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. The fact that he spat at her in the heat of argument, or that he called her late at night to yell at her, has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. The fact that he insisted that she pay her share of their joint living expenses has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. The fact that she decided to move out of their house and give up the baby for adoption and live off the adopting parents has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. The fact that he was an “ice cube” emotionally during a joint visit to one of her doctors has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. The fact that she availed herself of prenatal medical services under the Medicaid program, for which together they qualified, and that he then did not pay anything towards her medical expenses, has no logical capacity at all to prove or disprove whether he intended to assume his parental duties toward the child. If this were a chapter 39 proceeding for termination of parental rights, would any judge seriously entertain these facts for moment as tending to show that the father had abandoned a child even before the child was bom?
When something affecting a constitutionally protected right[6] must be proved with clear and convincing evidence, I do not believe it is possible to carry the day with facts that are susceptible to differing inferences, one probative and the other not. Evidence is not clear and convincing when it is consistent with both sides view of the case. When the inferences are vague, when the motives are murky, when the conduct is capable of being understood under different interpretations, the evidence cannot possibly fit the definition of the clear and convincing standard shown by Judge Klein.
I do not think that this statutory text is capable of being construed as allowing pre-birth conduct to show an intention of a father to abandon a child not yet born by anything other than the most definite, unmistakable and undeniable of acts. I think it requires nothing less than the father saying in the most positive terms or doing something impossible of misunderstanding that he has no intention of ever supporting his child. I do not believe that abandonment of an unborn child can be found by mere inference from conduct that is consistent with other less drastic meanings, or that it can be proven by anything short of the father saying so in the most unmistakable of words. Certainly, there is nothing in Doe or the statute itself that suggests a contrary meaning.
There is still another aspect of the clear and convincing standard, which everyone concedes governs this ease, that should be *940 stated. After the first hearing the trial judge unequivocally decided from the evidence that by any standard the father had not abandoned his child. Then after a rehearing, the same judge later decided upon essentially the same evidence that the same conduct by the same father amounted to clear and convincing evidence of abandonment. The original panel assigned to this appeal decided by a 2-1 vote that the evidence failed to meet the clear and convincing standard. Now the entire court of appeal has reviewed the case; and of 11 regularly serving judges, only 6 have decided that the evidence does meet the clear and convincing standard. No one has yet explained how evidence could be deemed legally clear and convincing unless every judge who reviewed it agreed that it was. Thus, if that many judges are so closely divided over whether the evidence is clear and convincing, that alone should be sufficient to demonstrate irrefutably that the evidence is anything but “of sufficient weight to produce a firm, belief or conviction without hesitancy.”
I believe so strongly that the evidence in this case fails to show abandonment by the required clear and convincing standard that I have decided (for it discusses the evidence in detail) to attach the original panel majority opinion, In re the Adoption of Baby E.AW., 19 Fla.L.Weekly D1336 (Fla. 4th DCA June 22,1994), as an appendix to this dissent.[7] In my opinion it is not possible to fairly read the transcripts of the various hearings and reasonably conclude that the evidence is so weighty and substantial that it produces a firm conviction of anything, and certainly no conclusion comes without considerable hesitancy. The sheer multiplicity of widely varying opinions among the 12 judges (counting the trial judge) who have considered this matter is the strongest possible confirmation I can think of to demonstrate the inadequacy of the proof here to hit the clear and convincing mark.
I join the majority, however, in certifying the question to the supreme court.[8] The subject of this statute is one of those areas of primary human conduct dealing with fundamental decisions affecting the family unit. Because of the importance of the adoption laws in this state and the confusing structure and lack of clarity in the abandonment provision, I believe that the supreme court should have the ultimate say in this case. Until the meaning of this statute is made absolutely clear, so that birth parents and prospective adopting parties will know precisely what is *941 expected of them, the unhappy circumstances of this case will only reoccur.[9]
GUNTHER and STEVENSON, JJ., concur.
APPENDIX
(Opinion filed June 22, 1994)
FARMER, Judge.
This case began by presenting a single issue of admittedly great consequence— namely, whether a birth father had waived the right to consent to the adoption of his child by reason of his conduct during the pregnancy. Unhappily, it has since become needlessly complicated with multiple irrelevant issues and thereby unreasonably delayed, all to the detriment of the child. In the end, nearly one year after originally deciding the waiver issue in favor of the father, the trial judge — confronted by a welter of heated contentions — reversed his ruling and, after hearing much evidence on issues that had no bearing on the waiver question, concluded that the father had forfeited the right to object to the child’s adoption. The father now appeals, raising multiple issues. We are compelled to reverse.
We begin with the relevant evidence, which is very much in conflict.[1] The birth mother and father, Linda and Gary, had been living together without marriage for some eight months when she became pregnant in November 1991. She told him of the pregnancy one month later, at Christmas. She had been working as a waitress, while he was employed as a painter. He earned $300-400 net weekly; her income is unknown. She was in an automobile accident in January 1992 and ceased working thereafter.
At that time, Linda had a 2-year old child by another man living with her and Gary.[2] She hoped that she and Gary would be married and that they would have a “Brady Bunch kind of family life.” Their financial arrangements, meanwhile, were that they would divide equally the monthly household bills consisting of rent ($600)’, electricity ($50-70), water ($25), and phone ($60). Each agreed to pay for her/his own food. Hence, without counting food, their base joint monthly living expenses for necessaries were more than $700.
In February 1992, out of work because of her accident, she applied for welfare benefits (AFDC) and food stamps. To assist her application, Gary signed papers reciting the above financial arrangements. It is not clear when she began receiving public assistance, 1.e. April or May 1992, but she ultimately began to receive monthly AFDC checks in the sum of $241, out of which she gave him $200 toward her share of household expenses. She also received monthly food stamps of $203, which she used to buy food for herself and her custodial child.
Hence, for the first six months of her pregnancy, he contributed more than half of their expenses, and thus regularly and continuously supported her in helping to maintain the household in which she resided. A brother of Gary, who had lived with Gary and Linda for a short time at the beginning of her pregnancy, testified that her financial contributions to the household were “a joke.” Their joint arrangement lasted until she voluntarily left the household on June 3rd.
During this period of joint residency, she never asked him to help her find health care; nor did he do anything to obtain medical care for her pregnancy. Along with welfare benefits, however, she received Medicaid prenatal care. There is no evidence in the record to show that either Gary or Linda were covered by any health insurance plan or that either or both together were in fact financially able to bear the costs themselves of prenatal health care services. Indeed, the only con- *942 elusion that the evidence will bear is that, at their combined income level with her pregnant, together they qualified for Medicaid.[3] Hence, he was not financially able to have provided her with prenatal health or medical care. From the very beginning, Medicaid was thus the only possible source of necessary obstetrical services.
Linda described Gary’s reaction to the news of her pregnancy as: “He smiled a little and basically that was it.” She also testified that he was cold to her during her pregnancy and offered no emotional support. Several witnesses testified that Gary drank alcoholic beverages frequently, was often drunk, and verbally abused her when he had been drinking. When she first broached the subject of adoption with him, she described his response as: “Do whatever you have to do.” At another point, when asked to illustrate how he had abused her, she recounted an incident in which he spat at her after she had used his razor. At other times he would call her names and tell her to “get out.”
A chiropractor treating Linda for her automobile accident injuries testified that Linda was always crying and very depressed. She complained to the chiropractor that Gary was offering her no emotional support. That was also the substance of testimony given by several of her friends.
From the time Linda began getting health care services for her pregnancy, she looked to other people for transportation to and from her providers. Gary did nothing to assist her in that regard. On the other hand, he worked during the day, and she usually saw her treating health care professionals during ordinary business hours. The evidence does not reveal whether she ever asked him to take her, although one of her friends testified that on occasion he would be home when the friend provided transportation for Linda. She testified that later, after they separated, he did accompany her for a sonogram.
Gary’s version was decidedly different. He described his reaction to the news that Linda was pregnant as “pretty happy, honestly overjoyed as a matter of fact. It was my first child. I was excited, wanted it, wanted a baby.” He acknowledged her growing unhappiness throughout her pregnancy, but explained that he accepted his mother’s advice that this was normal in pregnancy. He testified that he accompanied Linda for a sonogram on June 18th and that he posted the sonogram on his refrigerator. At one point he said ironically: “I supported Linda for a year and a half and her child, and now I don’t want my own?”
Furthermore, neighbors who had socialized with both testified that they observed the pair as being very loving during the time when Linda resided with Gary and that Gary brought the sonogram over to show them and was happy about impending fatherhood. His mother had even assisted him in his impending fatherhood by buying a crib which they set up in their house.
On June 3, 1992, without being compelled by him to do so, she decided to leave the house. At first she moved in with a girlfriend, but left that temporary housing on July 9th and moved into her own apartment, paid for through the prospective adoptive parents. Although she did not tell him where she was actually staying, she gave him a telephone number where she could be reached. Linda said that he called her several times over the ensuing three months, sometimes in the late night hours, trying to harass her, but he did not try to visit her. In fact, Linda testified that after he received notice of the adoption proceedings from the intermediary, Gary did attempt to contact her in what she described as one of his late night harassing telephone calls. Gary testified that she also called him after she had moved out.
*943 Gary did not inquire as to her medical care after she moved out, and he did not offer her any assistance during the three months before she delivered. On the other hand, neither did she ask him for any help in that regard. In fact, at the first hearing, she testified that after she moved out, she tried to avoid him. She had acquired an automobile by then and now drove herself to her providers. It was during this period that he accompanied her for the sonogram.
It is undisputed that when he received a letter from counsel for petitioners in July 1992 seeking his consent to the adoption, he telephoned the attorney/intermediary and “told her emphatically that I had no — there was no way that I was going to give this child up for adoption no matter what Linda has been telling her, there was no way.” He added that he immediately sought legal assistance from Legal Aid, and was ultimately referred to his present attorney, because “I want my daughter.” The attorney for petitioners testified that, in response to a notice she had sent Gary, he called her some two weeks before the actual birth and refused to consent to the adoption. She added:
“I said this is what you need to do and he said, oh, and they are going to pay all her fees and who’s helping me or something like that. I don’t know. He said, I’m not paying for nothing and he hung up on me, as a matter of fact.”
At the end of July 1992, the attorney/intermediary, Charlotte H. Danciu, filed a pre-birth petition for approval of expenses for an adoption of Linda’s baby, listing the expenses that the prospective adoptive parents had agreed to pay for Linda. These expenses included $625 for monthly rent and utilities, and $240 for food.[4] The judge signed an order authorizing payment of these expenses.
Danciu, as intermediary, also filed other necessary papers, including a report of intended placement, dated August 12, 1992, stating: “The birth fatherfs] consent has been waived by the court.” On August 12th, the judge also signed an order waiving Gary’s consent, stating: “The father was advised of the pendency of this hearing by attorney Danciu but has deliberately avoided receiving notice of this hearing by a duly appointed process server.” It also recited that: “The father abandoned the mother of the unborn child.” On September 1st, the intermediary filed with the court an unclaimed certified mail letter addressed to Gary indicating that the last postal notice to the addressee was dated August 13th, which happened to be the day after the order waiving Gary’s consent was signed.[5]
Danciu, as attorney/intermediary, also failed to inform the court of her telephone conversation with Gary, near the middle of August, in which he told the attorney that he contested the adoption and refused to consent to it.[6] We are just as appalled to learn that there is later testimony of the prospective adoptive parents that the attorney likewise failed to inform them of Gary’s objection and refusal to consent until after the birth of the baby.[7] We cannot help but think that a little candor from this intermediary might have prevented some of what occurred later.
E.A.W. was born without complication on August 28, 1992. On September 3rd, Gary served a motion to set aside the ex parte order waiving his consent. In sworn testimony, he said that after his mid-August con *944 versation with the intermediary he sought legal assistance to contest the adoption even before the baby was born. He contacted Legal Aid offices in both Broward and Palm Beach Counties. His efforts to obtain legal representation were delayed by Hurricane Andrew, as the Broward County office was closed for a week. Nevertheless, the evidence is unrefuted that he sought to assert his rights even before his child was bom.
On September 8th, the prospective adoptive parents [petitioners], through the attorney/intermediary, filed a petition for the adoption of Baby E.A.W. The petition contained a statement that the birth father’s consent was waived by the August 12th order, but made no mention of either the intermediary’s mid-August telephone conversation with Gary or his September 3rd motion to set aside the order of waiver. The petition was also accompanied by an HRS form with background information signed by Linda clearly identifying Gary as the father of the child. On September 18th, the court entered an order setting aside its August 12th order waiving the father’s consent. The court promptly scheduled an evidentiary hearing on the issue whether Gary’s consent should be deemed waived by his conduct.
After hearing substantially all of the above evidence at a hearing on October 9th, the trial judge entered an order one week later, on October 16, 1992, on petitioners’ motion to waive the birth father’s consent. The judge concluded from the evidence that “under any definition of abandonment, the natural father has not abandoned the natural mother or the child.” The court thereupon denied the motion to waive the birth father’s consent. On the very next day, Gary filed a petition for habeas corpus seeking custody of his child.
Within 10 days after the entry of the waiver order, however, petitioners moved for a rehearing on the abandonment issue. On November 3rd, counsel for petitioners in her capacity as the “Intermediary” filed a motion — which the court promptly granted— calling for the appointment of an attorney ad litem for the child.[8] On December 8th the attorney ad litem filed a motion in the name of the child for a rehearing of the waiver/abandonment issue, praying for a new hearing on the issue.
On January 5,1993, the trial court entered an order granting rehearing, saying as follows:
“While the Court is convinced that its order denying the request that the birth father be deemed to have abandoned the child was appropriate, the Court is concerned with due process in that the prospective adoptive child was not represented at the hearing and as such, may be able to develop factual information which could persuade the Court to reverse the previous decision that this Court made. Therefore, with reluctance, this Court grants the motion for rehearing as was filed by the prospective adoptive child through the child’s attorney * *
The order then set February 11th for a de novo evidentiary hearing “on the question of the alleged abandonment by the birth father of the prospective adoptive child.”
The rehearing began on February 11th but ended without hearing from all the witnesses whom the attorney ad litem intended to call. All of the evidence relating to the issue of abandonment presented at the rehearing by the petitioners and the attorney ad litem was in substance a rehash of the evidence that had been first presented at the October 9, 1992, hearing. To be sure, new witnesses testified. But, except for the intermediary, none of them gave additional evidence regarding the abandonment issue. The repeat witnesses (who had already testified at the first hearing) merely restated their previous testimony without offering any significant new facts.
On the other hand, much of the evidence received actually related only to the “best *945 interests of the child” and consisted of extensive facts surrounding the father’s conviction in Minnesota in 1977 for burglary and sexual battery. Included also was evidence about a 1985 arrest for sexual battery which resulted in an acquittal. It is fair to say that this criminal conviction and the later criminal charges, along with many collateral features, became the very focus of the rehearing.[9] The February 11th hearing ended with the court stating that it would set a date for a resumption of the rehearing testimony.
The rehearing finally resumed on August 3rd, and all the remaining additional evidence was received then. On September 20th, the court entered an order on rehearing essentially reversing its October 16, 1992, order (which had found no abandonment and no waiver), and instead found an abandonment and thus a waiver.[10] Explaining that the issue was whether there was clear and convincing evidence to establish that the father had abandoned the mother “financially and/or emotionally” during her pregnancy, the trial court based its turnabout on three essential grounds:
(1)the father failed to support the mother financially during her pregnancy and allowed her to become a public charge by having Medicaid pay for her prenatal care;
(2) the father failed to support the mother emotionally during her pregnancy; and
(3) instead of consenting to the adoption, the father sought the assistance of Legal Aid to assert his parental rights, which had the effect of creating chaos in the life of E.A.W.
The father timely filed his notice of appeal, and we have expedited these proceedings.[11]
We first pause to comment on the amount of time elapsing between the first presentation of the waiver issue and the final decision on that subject. What wé say on this subject is not meant to be a criticism of the trial judge in this case, but is instead intended to be advisory to the trial judges who hear these cases. Clearly a judge sitting in equity has the authority to change the judicial mind after a final judgment and order a trial de novo. See Hollywood Inc. v. Clark, 153 Fla. 501, 15 So.2d 175, 180 (1943). We think it may be improvident, however, to take months or more to do so in a contested adoption of a newborn infant.
*946 The strong interest of the child in having a stable family during the critical formative period of life argues with great force against the kind of judicial delays that may be appropriate in ordinary civil litigation. If a court is to rehear discrete issues in an adoption case, and the waiver issue is among the most critical, the rehearing should usually take place as soon as practicable and ahead of almost any other pending matter. Delays of months should be tolerated only when no possible consequence of delay can affect any interest of the child. Trial and appellate judges should be ever vigilant to press these cases to finality with alacrity, and should simply not allow the parties by inaction or stipulation to delay the matter.
Before we decide the legal sufficiency of the trial court’s grounds for concluding that the father had abandoned the mother during pregnancy, we must first discuss In the Matter of the Adoption of Doe, 543 So.2d 741 (Fla.1989), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989) [Doe]. There the court decided the certified question whether generally an unmarried father’s failure to assume support responsibilities and medical expenses for an unmarried mother who requires such assistance, and he is aware of her needs, is a basis for a trial court to excuse his consent to the adoption of his child on the grounds of abandonment.
In answering in the affirmative, the court paused to acknowledge the general validity of the fifth district’s holding in that case “that the best interest of the child is not a relevant factor unless the child was legally available to be adopted.”[12] 543 So.2d at 744. The court approved that statement, but with a qualification: when the birth father has delayed in making his interest in custody known and the child’s situation has changed during the period of the father’s delay, then the best interests of the child may be relevant to the waiver issue. As the court explained:
“For instance, there may well be circumstances where a natural father does not acknowledge or declare a parental interest in the child until after the child has been with the adoptive parents for a significant period of time during which substantial bonding has occurred. In such a case bonding would be a material consideration on the issue of abandonment.”
543 So.2d at 744.
Clearly that is not the case here. This father acknowledged and declared his parental interest in the child before she was even born. Indeed the attorney for the petitioners admitted that she had spoken to the father at least two weeks before the birth of the child and that the father had refused to consent to the adoption and stated his interest in raising the child. It is thus clear that the supreme court’s qualification on the irrelevancy of best interests evidence at the waiver hearing has no application here. Evidence relating to the best interests of E.A.W. was thus inadmissible on the issue whether this father had abandoned the mother during pregnancy.
This is really not a new holding, as that rule has long been applied in this state and by this court. In In re the Adoption of M.A.H., 411 So.2d 1380 (Fla. 4th DCA 1982), where the issue of abandonment was vigorously contested, we observed that the adoption law before 1973 did not require the child to be abandoned for the child to be adoptable. Although the legislative change requiring that the child be abandoned in order to be available for adoption was “hard to accept” in the opinion of Judge Letts, and the best interests of the child not yet relevant, we nevertheless decided that abandonment was indispensable to a court considering adoption and the best interests of the child. See also In re the Matter of Adoption of Noble, 349 So.2d 1215 (Fla. 4th DCA 1977); and In re the Adoption of J.C.E., 487 So.2d 1117 (Fla. 4th DCA 1986). In two widely publicized recent eases in other states, the same principle was applied. In re Petition of John Doe and Jane Doe, 159 Ill.2d 347, 202 Ill.Dec. 535, 638 N.E.2d 181 (1994); and In the Interest of B.G.C., 496 N.W.2d 239 (Ia. 1993).
We thus restate what has simply been the law in this state for a considerable amount of time and cannot be seen as new or revolu *947 tionary. The best interests of the child, except in the limited circumstance described in Doe, is not relevant to the threshold issue whether the birth father has waived his right to consent to the adoption by prebirth abandonment of the mother. Nor is this principle at odds with the legislative intent set forth in section 63.022(2)©, Florida Statutes (1993), that “[i]n all matters coming before the court pursuant to this act, the court shall enter such orders as it deems necessary and suitable to promote the best interests of the person to be adopted.” Earlier in the same statute, in subsection 63.022(2)(a) to be exact, the legislature has articulated, as its very first purpose in the listing of its intentions under the adoption statutes, thus: “The child is legally free for adoption.”
Giving section 63.022(2)© its literal and, we think, obvious meaning, therefore, there is no question of best interests to be considered because until there is a “person to be adopted” there is yet no specific child capable of being given to adoptive parents. Waiver must necessarily be first determined because, unless both birth parents consent to the adoption or their consent has been excused by reason of abandonment, the adoption proceedings are at an end.
Moreover, from a relevancy standpoint, waiver evidence is concerned with the past conduct of the parents; it is thus retrospectively concerned about parental history. In contrast, while it may include past conduct of the people whose claims are at issue, best interest evidence is concerned exclusively with the future of the child. When the question is solely whether a father has waived his right to consent to adoption by his conduct during pregnancy, it is irrelevant to consider evidence that tends to prove with whom, among the contenders, it will be in the best interests of the child to be placed for adoption.
We now analyze the facts in Doe and those in this case. As regards the answer to the certified question in Doe, the court’s discussion of the operative facts begins by noting that the father refused marriage and urged the mother to have an abortion. Although he and the mother saw each other regularly, when she lost her job and went on welfare he offered her no support at any time. In fact the trial court found that he initially agreed to adoption when she suggested it. The trial court had also found that when the father learned that the mother was pregnant, just before a planned ski vacation at Christmas break in December, he had already accumulated savings of $10,000 during that month on a job that was just ending.
Even though he knew he had to find a new job and that she was pregnant, he nevertheless went on the ski holiday with the mother and spent $4,000 of his savings on that vacation alone. He did however pay one month’s rent for the mother in February after their holiday and allowed her to use some furniture and a microwave oven. Aside from that single month’s rent and the use of these goods, he made no contribution out of his remaining $6,000 toward her support during her pregnancy. In her seventh month, she moved to Florida where her mother began arranging an adoption. She remained in contact with him and told him of the adoption plans. He now did not want an adoption but still refused marriage and offered no help. It was only after the child was bom and given to the prospective adoptive parents that he finally came forward to object to adoption, proposed marriage and acknowledged paternity. 543 So.2d at 742-743.
The court ruled that this conduct by the father during pregnancy “tend[ed] to prove or disprove material facts bearing on abandonment and may be properly introduced and used as a basis for finding abandonment under the statute.” 543 So.2d at 746. The court explained:
“ * ⅜ * the issue of abandonment turns on the question of whether the parent has evinced a settled purpose to assume parental duties. Providing prebirth support to the unborn child is a parental duty. Evidence of whether the parent has or has not furnished customary support to the pregnant mother is relevant to the issue of abandonment. In answer to the certified question we hold that an unwed father’s prebirth conduct in providing or failing to provide support responsibilities and medical expenses for the natural mother is relevant to the issue of abandonment under *948 section 63.072(1). We caution that this analysis cuts both ways. In circumstances other than those here, an unwed father would be justifiably entitled to argue that his conduct in providing prebirth support to his unborn child was relevant to his claimed right to refuse consent to the adoption of his child.”
543 So.2d at 746. The court went on to state that it was “satisfied that the record supports the trial judge’s conclusion that the [father’s] efforts were marginal and did not evince a settled purpose to assume parental duties.” 543 So.2d at 747.
We contrast the facts here with those in Doe. This birth father never suggested abortion, and the mother even admitted that he was happy when she told him that she was pregnant. Whether he impliedly acceded to an adoption early on is equivocal at best: “Do what you have to do.” Most importantly, he furnished more than half of the costs for housing for himself and the mother jointly, as well as for her 2-year old child, for at least a period of 6 months during her pregnancy. He stopped furnishing such support only because she decided to move out.
The evidence shows without contradiction that he regularly and continuously contributed to her support during the six months that they lived together. And there is no evidence in this record that Gary had the financial resources that the father in Doe enjoyed, or was able to furnish more than he did. Also in Doe, the father’s income would not have made father and mother living together eligible for Medicaid benefits, while here father and mother together were eligible for Medicaid. Unlike the mother in Doe who asked the father for help, Linda said that she had tried to avoid Gary after she moved out. Finally, Gary had made his objection to the adoption known well before the birth and placement of E.A.W. with the petitioners, while the father in Doe was urging other solutions right up until the child was born.
In 1992, the Florida legislature codified the decision of the supreme court in Doe as to the certified question. See Ch. 92-96, § 3, Laws of Fla. With that change, section 63.032(14) now defines abandonment as follows:
“(14) ‘Abandoned’ means a situation in which the parent or legal custodian of a child, while being able, makes no provision for the child’s support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If, in the opinion of the court, the efforts of such parent or legal custodian to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. In making this decision, the court may consider the conduct of a father towards the child’s mother during her pregnancy.”
§ 63.032(14), Fla.Stat. (1993).[13]
We turn to a consideration of the three grounds on which the trial court essentially based its decision on rehearing. As to the first ground of financial abandonment, the adoptive parents and attorney ad litem primarily base their contention on the fact that Gary failed to pay, or offer to pay, any of Linda’s prenatal medical expenses and that Linda had to resort to public welfare and Medicaid. They specifically point to Justice Shaw’s opinion in Doe, where he speaks of fathers who transfer their own burden of support to society at large. 543 So.2d at 749.
But his comments cannot be read in isolation and must be understood in the context of the facts in Doe, where a father squandered $4,000 on a ski vacation and failed to use any part of his $6,000 in savings (not to mention what he was capable of earning) to support the mother. Thus, the father in Doe was deemed to have abandoned the pregnant mother by allowing her to rely solely on welfare benefits when, all the while, the fa *949 ther had assets from which he could have supported her.
Here, there are no such comparable facts. To the contrary, neither this father or mother ever had the resources to pay for Linda’s prenatal care. Mother and baby were destined from the very moment of conception to receive their medical care out of public funds. To charge this father with abandonment because both mother and father could not afford prenatal care is to charge him for being poor.
The critical statutory text for this case is “while being able” in the definition of “abandoned.” When a father’s income is such that the father and mother living together as a family unit are eligible for Medicaid to pay necessary obstetrical expenses, it cannot be said that the father “while being able” has abandoned the mother financially or has lived off of her during her pregnancy, when he merely “acquiesces” in the mother’s acceptance of Medicaid benefits for prenatal care.[14] The presence of those words in the statutory definition of abandonment prevents fathers who are incapable of paying for health care from being accused of abandoning their parental duties. As we have already observed, with Gary and Linda’s combined income they qualified as a family unit for Medicaid pregnancy benefits. There was no reasonable basis to charge Gary with failing to pay for all or part of her prenatal medical costs, when the governmental standards establish that persons with Gary and Linda’s joint income required Medicaid assistance m order to assure adequate prenatal care. Here, the proponent of abandonment, the petitioners, failed to show that Gary had the ability with his income level to furnish the necessary level of obstetrical care. Hence, the first ground for the trial court’s change of mind is legally insufficient.[15]
The second ground for finding an abandonment on rehearing is equally insufficient. The focus of both the trial court and appel-lees is on whether he supported her emotionally. To rely on a father’s lack of emotional support for the mother during pregnancy, without any showing that the lack of emotional support so harmed the mother that the child she was carrying suffered direct physical injury, is entirely too vague a standard on which to base a finding of abandonment. Even assuming that the legislature could leave this important ingredient to judicial definition on a case by case basis, there would still have to be some statutory standards as to precisely what emotional support is required. Without a textual foundation in the statute, we are unable to infer abandonment from the mere failure of a father to give prenatal emotional support to the mother.
Moreover, even if there were a statutory element of emotional support, it would necessarily apply to all parents, married or unmarried, divorcing or divorced. That is true because there is nothing in the statute itself to suggest that such a requirement applies only to unmarried fathers. Indeed it is the very application of the abandonment law to *950 married parents, as well as the unmarried, that saves the statute from unconstitutionally denying equal protection. Doe, 543 So.2d at 747. We cannot help but note that applying to married fathers the requirement of emotional support to the mother during pregnancy yields very curious results: e.g. one might then colorably contend that divorcing parents forfeit the right to custody of minor children because they stop supporting each other emotionally during a pregnancy. Hence, the statute simply will not bear the construction that an unmarried father is required to provide emotional aid and comfort to the mother during pregnancy in order to avoid a finding of abandonment.
The statutory definition speaks of “support,” not of love and caring.[16] We understand the statutory text, “makes no provision for the child’s support” and “conduct of the father toward the mother during her pregnancy,” to relate to the mother’s material needs of shelter, food, and medical or prenatal care affecting her physical well being.[17] Our statutory analysis begins with the fundamental interest that a birth parent has in the custody, fellowship and companionship of the parent’s children. In re Guardianship of D.A.McW., 460 So.2d 368 (Fla.1984) (strong public policy in favor of natural parent having custody of child); State ex rel. Sparks v. Reeves, 97 So.2d 18 (Fla.1957) (biological parent has natural God-given right to custody of child; rule is older than common law). The United States Supreme Court and the Florida Supreme Court have jointly established the rule that strict scrutiny is customarily given to statutes affecting the fundamental liberty interest in parenthood. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); cf. Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (constitution does not bar a state from allowing the adoption of 2-year old child without notice to the biological father, where the father had no significant custodial, personal or financial attachment to child); In re the Interest of R.W., 495 So.2d 133 (Fla.1986). Consequently, we find the second ground for the judge’s change of decision also legally insufficient.
Last, we address what seems to have most affected the trial judge — the fact that the father sought help from Legal Aid to assert his parental rights. Access to legal services is not only a constitutionally protected right but, as the father’s resort to Legal Aid demonstrates, we have now created statutory rights to publicly funded legal services.[18] It *951 should also come as no surprise that anyone whose income places them below the federal poverty level qualifies for such assistance. Hence if we are to castigate eligible parents for seeking legal aid, we might just as well blame them for seeking welfare benefits or Medicaid for which they have qualified under the applicable statutes and regulations.
Of course, this simply cannot be an attainder, any more than poverty itself can be understood as evidence of one’s lack of legal worth. No one should be made to suffer some legal impediment for exercising an entitlement to Legal Aid, any more than one should suffer for exercising the underlying right to be vindicated by such legal services. To draw an adverse conclusion from asserting the legal rights of a birth father, i.e. to infer harm to the child from the very assertion of the father’s claim to the child, is to damn the parental right.
Florida has long recognized that a parent is entitled to counsel when the state seeks to terminate parental rights. See In the Interest of D.B., 385 So.2d 83 (Fla.1980); see also § 39.465(1)(a), Fla.Stat. (1993). Can we logically leap from that recognition to penalizing a father simply for seeking legal aid to contest whether he should be deemed to have abandoned his unborn child during pregnancy? It would be strange legal reasoning to provide counsel in the one circumstance but punish the use of legal services in the other. It would also be entirely antithetical to the basic right of a birth parent to the society and custody of a child. We thus find this last ground legally insufficient for the court’s abandonment decision.
Among the most difficult cases encountered by judges are those concerning the contested adoption of a minor child. No matter what path judges choose in these cases, the effects on the child’s life will be profound. Even with the brightest of auguries in the form of uncontradieted evidence, the future may be markedly different than envisioned and, in any event, not the same if another decision had been made. In short, even when everything has been done with scrupulous exactitude throughout the adoption proceedings, the best interests of the child are simply unknowable, and confidence that the best has been chosen is unattainable. It is primarily for that reason that we have laws to govern judges in adoptions, and not their hearts or emotions. Our decision today should be so understood.
The question of custody of E.A.W. is not before the court on this appeal. It is unfortunately true that the persons a child gets as parental custodians have a profound effect on the development of that child. In the great scheme of things, many children might benefit from having adoptive parents instead of their birth parents. And so while much of the evidence below might call into question the ability of either this father or this mother to be the best parent for E.A.W., that is of no interest to the law until the nondependent child is available for adoption, through either a waiver/abandonment or a termination of parental rights.
We decide cases on the legal issues presented to us, as we are required to do within the system of justice that governs disputes between our citizens. Our code of laws, rather than the primal feelings of human judges, is the source of our strength as the world’s oldest democracy. The right of birth parents to the society and custody of their children is an ancient right of civilized people and among the most prized. Florida’s statutory laws recognizing and enforcing these interests of birth parents are too well established to be ignored. That explains what we have been compelled to do today.
We therefore reverse the order finding that the birth father has waived his right to consent to the adoption and the final judgment of adoption. On remand, the court shall also set aside the mother’s consent, which was itself conditioned on the father’s consent being obtained, and conduct further proceedings consistent with this opinion.
REVERSED AND REMANDED WITH DIRECTIONS.
WARNER, J., concurs.
HERSEY, J., dissents with opinion.

. § 63.032(14), Fla.Stat. (1993) (" 'Abandoned' means [that a father], while being able, makes no provision for the child’s support and makes no effort to communicate with the child, which * * * is sufficient to evince a willful rejection of parental obligations. If, in the opinion of the court, the efforts of [the father] to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. In making this decision, the court may consider the conduct of a father towards the child's mother during her pregnancy.”) [e.s.]

. The leading dictionaries generally define support as used in this sense as: (1) “maintenance, as of a family, with the necessities of life,” American Heritage Dictionary of the English Language 1804 (3d ed.); (2) "that which supports life; supply of necessaries; means of livelihood or subsistence; formerly sometimes simply food, provisions,” Oxford English Dictionary 1968 (compact 2d ed.). To be sure, the OED also includes an additional meaning or sense as *'[s]piritual help; also subjectively, mental comfort.” It is clear from the OED text, however, that this is at best a weak, or tertiary, sense. Indeed, the AHD does not even bother to include that tertiary sense.

. I disagree with any attempt to denigrate the parental right of an unmarried father, just as I would not agree with any attempt to minimize the parental right of an unmarried mother. As Judge Stevenson has shown in his thoughtful dissenting opinion today, the ties between birth parents and their children are mystically strong. While the father’s role in procreation and birth may be limited by nature to fertilizing the egg, it is still an indispensable contribution. The fact that the mother may have the exclusive right to say what will happen with the fetus in no way supports the conclusion that she has the exclusive right to say what will happen with the child.

. In appellee's motion for rehearing there is a contention that the father was given notice of the hearing on the prebirth petition for adoption and simply failed to attend it. They newly include a notice of hearing that was filed in the trial court just four days before the scheduled hearing on the petition. This notice was not in the record submitted to us, but I accept appellees' contention that it was part of the court file.
The notice does not contain a certificate of service. Nor does it state whether, or how, it purportedly was served on the birth father. Nor does the record contain any specific evidence that it was actually served or that appellant ever received it. Moreover, the document was filed 6 August 1992, a Thursday, and purported to give notice of a hearing to be held on the following Monday. That amounts to giving a birth father no more than two working days notice to prepare for a hearing in which his right to object to the adoption of his child will be determined.
Quite apart from its obvious failure to qualify as service of process, I would have little trouble in finding such notice insufficient and unreasonable. See Fla.R.Civ.P. 1.090(d) ("A copy of any written motion which may not be heard ex parte and a copy of the notice of the hearing thereof shall be served a reasonable time before the time specified for the hearing."); State Dep’t of Transp. v. Plunske, 267 So.2d 337 (Fla. 4th DCA 1972) (five days notice of hearing generally required, less may be allowed if actual notice is received and there is time to prepare); Matter of Adoption of Baby Doe, 572 So.2d 986 (Fla. 1st DCA 1990) (two days notice to birth father of hearing on adoption insufficient); Johnson v. Henck, 482 So.2d 588 (Fla. 1st DCA 1986) (two days notice of hearing in custody matter insufficient). In this case, there is positive evidence that the father never received this particular notice.

. The Illinois Supreme Court reached a decision in its "Baby Richard” case that is indistinguishable from the original panel majority decision in this case, and now the United States Supreme Court has refused to disturb the Illinois decision. Petition of Doe, 159 Ill.2d 347, 638 N.E.2d 181, 202 Ill.Dec. 535 (Ill. June 16, 1994), cert. denied sub nom. Baby “Richard", a/k/a Baby Boy Janikova v. Kirchner (Otakar),— U.S.—, 115 S.Ct. 499, 130 L.Ed.2d 408 (1994), and Doe v. Kirchner (Otakar), — U.S. —, 115 S.Ct. 499, 130 L.Ed.2d 408 (1994).

. I do join Judge Pariente's comments about the intermediary. This record suggests strongly that much of what has happened procedurally in this case could have been avoided if she.had been more forthcoming in dealing with the court and her clients.

. The constitution requires that parental rights be terminated, if at all, on at least clear and convincing evidence. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

. Actually, Linda was already the mother of three minor children when she became pregnant with Gary’s child. Her two older children resided with their father, while Linda had custody of the youngest.

. See § 409.903(5), Fla.Stat. (1991) (after Jan. 1, 1992, where pregnant woman lives in family unit with income at or below 185% of most current federal poverty level, woman is eligible for Medicaid benefits during entire pregnancy and post partum period). The applicable federal poverty level when Linda became pregnant was fixed at not less than $2066 in monthly income. Accepting the trial court's resolution of the evidence to result in a finding that Gary earned the highest amount testified ($400 weekly, rather than $300), Linda and Gary had a combined monthly income of far less than $2066.

. We note that Linda's expenses after leaving the house she shared with Gary were significantly greater than the amount she was able to contribute to the household expenses when she and Gary lived together. It is impossible from the evidence to find that he had the ability to maintain separate households for both of them apart.

. It is difficult to fathom the purpose for this filing, other than to suggest that the father was avoiding service. If so, the fact that the post office had not yet given final notice of certified mail to the addressee should have suggested to the intermediary that it was then improper to seek an order waiving the addressee’s consent.

. See R.Reg.Fla.Bar 4-3.3(d) (“In an ex parte proceeding a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse.”). The burden of candor on an attorney acting as an adoption intermediary is especially acute; for the consequences of a lack of candor may, as here, redound to the detriment of the newborn child to be adopted.

. See R.Reg.Fla.Bar 4-1.4 (lawyer shall keep client informed about status of matter).

. We can find no basis in this case for the appointment of an attorney ad litem for E.A.W. Under section 63.052(1), Florida Statutes (1993), upon the entry of the placement order petitioners became her legal guardians. Section 63.062(l)(c), Florida Statutes (1993), expressly provides that only a child older than 12 years of age has standing to object to the adoption. In this case, E.A.W. did not have standing to object to the adoption and thus had no cognizable interest to assert on the abandonment issue.

.In his final order on rehearing, the trial judge expressly stated that, because he was now finding that the father had abandoned the mother during pregnancy:
"it is unnecessary * * * to delve into the question of the best interests of the child and, therefore, the Court finds that the various objections which were raised to the introduction of certain exhibits and/or testimony would become moot."
We are thus required to accept his statement that the judge did not base his abandonment decision, for example, on testimony from another woman that the father had attempted a sexual battery on her, or that he had had consensual sex with her during Linda’s pregnancy. We assume, without deciding, that such evidence might be relevant to the best interests of the child in resolving a custody dispute between Linda and Gary, as the dissent suggests. We do not agree, however, that it was relevant to the abandonment issue. Nor do we think that it must be considered at all in judging the legal sufficiency of the trial judge’s abandonment decision, because of his declaration that he did not rely on it in deciding the rehearing.
To be sure, as a review of the rehearing transcript shows, this irrelevant evidence about Gary's criminal conviction, his 1985 acquittal and the woman’s testimony became such a feature of the rehearing that we have serious doubts that this evidence did not have at least a subconscious effect on this judge — who, after all, had previously decided the same issue strongly in favor of Gary on virtually the same admissible evidence. It is most difficult, therefore, escaping the belief that it did effectually “poison the well.” If we were not reversing his decision on legal sufficiency grounds, we would surely reverse and remand for a new trial on the abandonment issue before a different judge.

. One week later the court entered a final order of adoption.

. By an order entered November 10, 1993, we expedited this case and advanced the briefing schedule. We then expedited oral argument which was held on February 14, 1994. Our consideration, research and writing after oral argument has been, both collectively and individually, substantial and time consuming. Several drafts of opinions have been exchanged, reconsidered, revised and entirely rewritten. Thus, while it may not appear when this opinion is finally released that the case has been very much "expedited," all of the judges on the panel have spent a considerable part of their time since oral argument on this one case.

. See In the Matter of the Adoption of Doe, 524 So.2d 1037, 1041 (Fla. 5th DCA 1988).

. The 1992 change added the above entire paragraph to chapter 63, but the first two sentences had long been part of section 39.01(1), as indeed the court in Doe itself observed. 543 So.2d at 745. The definition of abandonment relates to sections 63.062 and 63.072, Florida Statutes (1993). The former requires the consent of a father, and the latter provides that the consent of a parent may be excused if the court finds that the parent has abandoned the child.

. In this case, Linda testified that she received AFDC benefits. Her entitlement to those benefits arose from the fact that she had her 2-year old child living with her and Gary. She was using her AFDC income, as intended, to provide the necessaries for her living child. Under the agreement between Linda and Gary, they divided rent and utilities equally, as to which Linda paid her share from her AFDC proceeds. Would she have been better off to have lived by herself in a cheaper apartment and thus paid the full rent and utilities directly to the landlord out of the same AFDC income? It is impossible from this arrangement to accuse Gary of living off of her AFDC income. The fact that the law imposes an obligation on a father to support a mother during pregnancy does not relieve the mother herself from a corresponding obligation to provide some of her own support, when she is able to do so. There is nothing in either the statutory definition of abandonment or in Doe that suggests otherwise.

. We note that some cases have held that the mere failure of a natural parent to support the child does not, in and of itself, provide a sufficient basis for allowing an adoption of the child over the parent’s objection. See Smith v. Fernandez, 520 So.2d 654 (Fla. 3d DCA 1988), citing Hinkle v. Lindsey, 424 So.2d 983 (Fla. 5th DCA 1983). Some cases have squarely held that the failure to support the child for a period of over 2 years is insufficient to justify termination of parental rights. Smith, 520 So.2d at 654; In re Gossett, 277 So.2d 832 (Fla. 1st DCA 1973). By that measure, surely the lapse of 3 months, the longest period of nonsupport that the facts in this case will bear, is thus palpably insufficient.

. We do not suggest that emotional support is not immensely desirable, or that civilized man has no moral obligation to offer emotional support to the woman bearing his child. Rather, we hold only that the legislature has not unmistakably said in a clear statutory text that the failure to give emotional support constitutes abandonment of the mother.

. Even if emotional indifference or abuse were relevant prebirth conduct evincing an abandonment of the child, the basis for the relevancy is indisputably the effect such conduct has on the child, rather than the mother alone. Doe plainly shows that the rationale for considering the conduct of the father toward the mother during pregnancy was tied to how it affected the future welfare of the child. As the court did in Doe, it is appropriate to refer to the comparable provisions in chapter 39 as regards the waiver of parental rights to newborn children. There is a logical relationship between both abandonment and abuse in termination of parental rights proceedings under chapter 39 and waiver of parental rights proceedings under chapter 63. As to both proceedings, the underlying focus of the applicable statutory provision is conduct that already has, or is likely to have, an adverse effect on the child involved. Compare §§ 39.01(1) and (2), with § 63.032(14). Section 39.01(2) defines “abuse” as intentional acts "that result in any physical, mental, or sexual injury that causes or is likely to cause the child’s physical, mental, or emotional health to be significantly impaired." There is absolutely no evidence in this record showing any impairment to baby E.A.W.'s health. Our research has failed to unearth a single case in which parental rights were terminated because one parent abused the other parent, as opposed to the child. The essential relevance of conduct by the father toward the mother during her pregnancy lies in how it has affected the well-being of the child during pregnancy and whether such conduct demonstrates indifference towards the child, rather than the mother.

.See Art. I, § 21, Fla. Const.; and 42 U.S.C. §§ 2996-2996k. State revenues also fund county legal aid programs to provide legal services to the indigent in civil cases. See §§ 28.241 and 34.041, Fla.Stat. (1993).